# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **SAMUEL JOHNSON, in his individual capacity, and JILL JOHNSON, in her individual capacity,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**KATHY GRIFFIN, in her individual capacity,**<br><br>**Defendant.** | **Case No.** _____<br><br>**Judge** _____<br><br>**JURY DEMAND** |

## COMPLAINT

**Demand for Jury Trial: Pursuant to Fed. R. Civ. P. 38(b) and Local Rule 7.03(b), Plaintiffs hereby demand trial by jury on all issues so triable.**

**COME NOW** Plaintiffs, Samuel Johnson ("Mr. Johnson") and Jill Johnson ("Mrs. Johnson") (sometimes collectively referred to herein as "Plaintiffs"), by and through undersigned counsel, and for their Complaint against the Defendant, Kathy Griffin ("Ms. Griffin" or "Defendant"), state as follows:

### NATURE OF THE ACTION

1.      This is an action for tortious interference, intentional infliction of emotional distress, invasion of privacy, and prima facie tort arising from the malicious, wrongful, unlawful, and intentionally injurious online harassment and stalking committed by Ms. Griffin in late April 2021.

2.      Prior to Ms. Griffin's conduct, Mr. Johnson was the chief executive officer ("CEO") of WeCounsel Solutions, LLC d/b/a VisuWell ("VisuWell") for approximately three years.

1

3.      In April 2021, an incomplete, edited, and out-of-context cell phone video clip was posted on various social media platforms, including TikTok and Twitter (the "Video Clip" or the "Clip"). The Video Clip only showed one minute of an incident that had been developing for over one hour. The implication created by the Video Clip—that Mr. Johnson instigated a confrontation to bully two LGBTQIA+ teenagers at a hotel—was deeply misleading.

4.      Mr. Johnson, in truth, was at a hotel restaurant eating dinner with his family. Mr. Johnson and his family were regular patrons of that local restaurant. During his meal, the teenagers in question, along with others in their group, had been continually loud and disruptive, shouting obscenities and swears in the midst of a family restaurant. Mr. Johnson left his table to visit the restroom. When Mr. Johnson was walking back from the restroom, and while taking no action towards the teenagers, they verbally attacked him with loud voices and swear words, exacerbating an already-noisy scene that had pre-existed his specific encounter with the teenager. This incident will be alleged in detail, below, and will be referred to as the "April 24 Incident."

5.      Ms. Griffin is a malign internet provocateur and is notorious for her disturbing posts on various social media platforms, especially Twitter. Her preferred method of online harassment is to "dox" private citizens, accusing them of egregious or reprehensible conduct and then posting their personally identifiable information, such as their address and workplace.

6.      Consistent with that reputation, on April 26, 2021, in a campaign to harass and stalk Mr. and Mrs. Johnson online, Ms. Griffin published a tweet via her verified personal Twitter account encouraging her followers and the public to "dox" and shame Mr. Johnson and his wife, as well as pressure VisuWell into terminating Mr. Johnson's employment contract. Ms. Griffin also published other tweets in reference to the Video Clip consistent with her malicious and intentionally injurious objective to engage in online harassment of Mr. and Mrs. Johnson.

2

7.    Ms. Griffin published her tweets for the sole purpose of injuring Mr. and Mrs. Johnson in their professional and personal reputations and careers.

8.    It was Ms. Griffin's first tweet about the Video Clip that singlehandedly caused the Video Clip to go viral and reach widespread prominence on the internet. Ms. Griffin's first tweet about the Video Clip brought the April 24 Incident to the forefront of America's "culture wars" for several days in late April 2021.

9.    Ms. Griffin's tweets directly, and as a substantial factor, caused Mr. Johnson to be terminated from his position as the CEO of VisuWell.

10.    This action seeks redress for Ms. Griffin's conduct, which was wholly malicious, unreasonable, and outrageous and has no place in a civilized society.

## PARTIES, JURISDICTION, AND VENUE

### A.    MR. JOHNSON

11.    Mr. Johnson is a highly successful leader and sales professional who has spent the bulk of his twenty-five-year career in the healthcare technology field.

12.    During his career, Mr. Johnson has held positions of major responsibility with several companies in this sphere.

13.    During the three years he was the CEO of VisuWell, Mr. Johnson led the company away from the brink of extinction and helped increase its sales by 1,200%. VisuWell is now a rapidly growing technology company that serves the healthcare industry.

14.    VisuWell's commercial success was due in large part to the proprietary software program Mr. Johnson previously developed and brought to VisuWell.

15.    Mr. Johnson developed the proprietary software program through his own risk capital and hard work.

3

16. The proprietary software program was and is still being used by VisuWell to provide telehealth services to various medical providers across the United States.

17. Prior to Ms. Griffin's conduct, Mr. Johnson had an impeccable reputation and was highly regarded in the professional community and by his family, friends, peers, and business colleagues.

18. Prior to Ms. Griffin's conduct, Mr. Johnson had a lucrative employment contract with VisuWell. A true and correct copy of Mr. Johnson's employment contract with VisuWell, with irrelevant portions redacted, is attached hereto as *Exhibit A*.

19. VisuWell has its offices and principal place of business in Tennessee.

**B.     MRS. JOHNSON**

20. Mrs. Johnson is a successful small business owner, manager, and designer at her family-owned business known as Storehouse No.9 in Franklin, Tennessee.

21. Mrs. Johnson is married to Mr. Johnson.

22. Prior to Ms. Griffin's conduct, Mrs. Johnson had an impeccable reputation and was highly regarded in the community and by her family, friends, and peers.

23. Prior to Ms. Griffin's conduct, Storehouse No.9 had an impeccable reputation and was highly regarded in the community.

**C.     MS. GRIFFIN**

24. Ms. Griffin is a niche comedian, actor, and controversial public figure with a notorious history of political and cultural antagonism masquerading as advocacy.

25. For the last two decades, Ms. Griffin has created and been involved in numerous political and cultural controversies that have been the subject of widespread public attention and rebuke.

4

26.     For example, in 2007, after having accepted an Emmy Award for best reality TV program for her Bravo series, *My Life on the D-List*, Griffin's speech was deleted from the pre-taped telecast because she made a derogatory comment about Jesus while onstage. In 2012, while appearing on CNN's live coverage of New Year's Eve in Times Square with Anderson Cooper, Ms. Griffin stripped down to her bra and underwear, violating CNN's "no nudity" rule. A year later, Ms. Griffin appeared to simulate oral sex on Anderson Cooper during CNN's live coverage of New Year's Eve in Times Square.

27.     Perhaps most infamously, in May 2017, Ms. Griffin posted a video of herself holding a mask styled to look like the severed, bloody head of U.S. President Donald Trump, which was posted on her Instagram and Twitter accounts:



The image, above, received widespread attention and condemnation from all individuals of varied political or cultural affiliation. As a result of the image, CNN fired her from its New Year's Eve broadcast with Anderson Cooper, who called the image "clearly disgusting and completely inappropriate." Ms. Griffin stated that image made her the subject of a federal investigation by the Justice Department. Ms. Griffin later took down

the image and apologized for posting it. However, in November 2020, the day after the 2020 U.S. presidential election, Ms. Griffin posted the same image again on her Twitter account.[1]

28.     Ms. Griffin has acknowledged that her rhetoric is divisive and has claimed that it has caused her to be banned from numerous talk shows, including *The Tonight Show with Jay Leno* and *The View*, as well as notable performance venues such as the Apollo Theater in New York City.

29.     Ms. Griffin is highly active on social media and uses her accounts to engage in online harassment by attacking and shaming individuals with whom she disagrees politically.  Moreover, she routinely uses her accounts to promote and encourage other users to form cybermobs to "dox" certain individuals, i.e., publish their name, address, and contact information for other users to stalk, attack, and cancel. It is well-known that Ms. Griffin uses her social media as a weapon to harass, stalk, and shame people whom she dislikes or with whom she disagrees.

30.     For example, in 2019, Ms. Griffin was sued for her tweets regarding an edited and out-of-context viral video that depicted a high school student standing and smiling in front of a Native American man named Nathan Phillips. Ms. Griffin tweeted, among other things, "Name these kids. I want NAMES. Shame them. If you think these fuckers wouldn't dox you in a heartbeat, think again." This tweet is still available online and can be accessed by the Court at: https://twitter.com/kathygriffin/

---

[1] *See* Reid Nakamura, *Kathy Griffin Re-Posts Photo of Fake, Bloody Trump Head*, (Nov. 4, 2020), https://www.thewrap.com/kathy-griffin-re-posts-photo-of-fake-bloody-trump-head/.

6

status/1086927762634399744?s=20&t=9Ebdg-uQQtZPshwt9jpx9w (last visited April 21, 2022).

31.    Ms. Griffin has stated that she is an advocate for LGBTQIA+ rights and has organized various rallies and published various statements to that effect.

32.    Prior to the April 24 Incident and the Video Clip, Mr. Johnson and his wife were complete strangers to Ms. Griffin.

D.    **JURISDICTION AND VENUE**

33.    Mr. Johnson is a citizen of the State of Tennessee. Mr. Johnson resides and is domiciled in Williamson County, Tennessee, which is in the Nashville Division of the Middle District.

34.    Mrs. Johnson is a citizen of the State of Tennessee. Mrs. Johnson resides and is domiciled with Mr. Johnson in Williamson County, Tennessee, which is in the Nashville Division of the Middle District.

35.    Ms. Griffin is a citizen of the State of California. Ms. Griffin resides and is domiciled at 6329 Zumirez Drive, Malibu, California 90265.

36.    There exists complete diversity of citizenship between the Plaintiffs (Tennessee) and Ms. Griffin (California). The amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests, costs, and attorneys' fees. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

37.    This Court has specific personal jurisdiction over Ms. Griffin pursuant to Tennessee's long arm statutes and the due process requirements of the United States Constitution. As alleged below, Ms. Griffin purposefully availed herself of the privilege of acting in Tennessee, the causes of action below arise from and relate to Ms. Griffin's activities in Tennessee, and the consequences caused by Ms. Griffin's actions directed

7

towards Tennessee are substantial enough to make the exercise of personal jurisdiction over her reasonable.

38.     Ms. Griffin, as alleged below, in published in April 2021 several tweets specifically directed to the State of Tennessee and at least two of Tennessee's citizens about an event that occurred at the Harpeth Hotel in Tennessee. As alleged in more detail below, Ms. Griffin's tweets specifically mention and are directed to "Franklin, Tennessee" and "Nashville, Tennessee." Moreover, her tweets specifically target three Tennessee citizens, Mr. and Mrs. Johnson and VisuWell, and state that Mr. and Mrs. Johnson "reside in Franklin, Tennessee…." Ms. Griffin had actual knowledge that Mr. and Mrs. Johnson reside in Tennessee as indicated in her tweets. Ms. Griffin's tweets concern the Video Clip of the April 24 Incident, which occurred at the Harpeth Hotel in Tennessee. The above allegations are sufficient to make prima facie showing of personal jurisdiction over Ms. Griffin. *Santoni v. Mueller*, No. 3:20-cv-00975, 2022 U.S. Dist. LEXIS 4336, at *17 (M.D. Tenn. Jan. 10, 2022).

39.     By directing her tweets at the State of Tennessee, citizens of Tennessee, and about events that occurred in Tennessee, Ms. Griffin purposely availed herself of the privilege of acting in Tennessee and causing a consequence in Tennessee.

40.     The causes of action alleged herein all arising out of and relate to Ms. Griffin's tweets that are directed at the State of Tennessee, citizens of Tennessee, and about events that occurred in Tennessee.

41.     Exercising jurisdiction over Ms. Griffin in this case would be fair and reasonable because her tweets evidence, on their face, her knowledge that she was directing her conduct at the State of Tennessee and its citizens.

8

42.     Exercising jurisdiction over Ms. Griffin would not offend traditional notions of fair play and substantial justice because Ms. Griffin could have, and indeed should have, reasonably foreseen being haled into a Tennessee court after she targeted Mr. Johnson and his wife in Tennessee over events that occurred Tennessee, and demanded to VisuWell, a citizen of Tennessee, that Mr. Johnson be discharged as its chief executive officer.

43.     As well, Ms. Griffin has routinely derived revenue from the State of Tennessee through various live performances that she has conducted in Tennessee. For example, she has performed at the Polk Theater in Nashville, Tennessee and at the Schermerhorn Symphony Center in Nashville, Tennessee.

44.     Ms. Griffin is a nonresident of Tennessee and cannot currently be personally served within process within this state.

45.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Ms. Griffin is subject to personal jurisdiction in this District, and/or a substantial part of the events giving rise to this claim occurred in this District, including but not limited to the April 24 Incident and the termination of Mr. Johnson's employment.

## DETAILED FACTUAL BACKGROUND

### E.     THE APRIL 24 INCIDENT

46.     For Mr. Johnson, Saturday, April 24, 2021, began like any other. He spent most of the morning catching up on errands and to-do's that had accumulated over the past week. In the afternoon, he took his dog for a walk, then went to his office to work.

47.     In the evening, Mr. Johnson had plans to meet his son and his son's girlfriend for an early dinner at the Harpeth Hotel's 1799 Restaurant in Franklin, Tennessee.

9

48.     Mrs. Johnson was out of town and was not at the Harpeth Hotel during the April 24 Incident.

49.     A little after 5:00 p.m., Mr. Johnson walked from his office to the Harpeth Hotel a short distance away. He was the first of his group to arrive.

50.     While he was waiting for his son and his son's girlfriend, Mr. Johnson sat in the common area and initiated a conversation with a gentleman from California who was on a house-shopping trip in Tennessee.

51.     During that conversation, the two men were interrupted several times by loud yelling, cursing, and invasive noise in the lobby and restaurant area.

52.     The vulgarities were emanating from a group of approximately 40 to 50 teenagers dressed for prom, entering the hotel lobby and area where the two men were seated.

53.     Mr. Johnson did not know any of the teenagers. The teenagers were complete strangers to Mr. Johnson.

54.     The noise and vulgarities continued for approximately 45 to 50 minutes as the group of teenagers moved freely around the hotel, taking photos with different backdrops in the facility.

55.     The vulgarities, including shouting, profanity and simulated sex acts, were the worst Mr. Johnson had ever seen or heard in a public place. The customers in the hotel were even making concerned eye contact with one another, shaking their heads, and were clearly disappointed that neither the staff nor the adult chaperones were keeping the promgoers under better control.

10

56.     At one point, a mother of a young child walked by Mr. Johnson, scooped up the child and whispered toward Mr. Johnson, "I can't believe this is happening right now," and left the building.

57.     Because of all the commotion, Mr. Johnson offered to pay the visitor's check, hoping to leave the visitor with a favorable impression of Franklin. The visitor allowed Mr. Johnson to pay his check and left the hotel restaurant.

58.     About that same time, Mr. Johnson's son and his son's girlfriend arrived. Both immediately noticed the noisy prom group and asked what was going on. Mr. Johnson told them about the prolonged noise and vulgarities. Mr. Johnson expressed his hope that the group would soon leave for the prom.

59.     The prom was not being held at the Harpeth Hotel.

60.     The promgoers were not patrons of the Harpeth Hotel.

61.     Despite the fact that non-patrons of the hotel were causing an enormous disturbance, the hotel took no action to address the problems confronted by Mr. Johnson and its other paying guests.

62.     Mr. Johnson and his group ordered food. Mr. Johnson then excused himself to go use the restroom.

63.     To get to the restroom, Mr. Johnson had to walk through the courtyard where the group of teenagers were now standing. He again encountered loud, vulgar, and obnoxious language and behavior coming from the prom group. Mr. Johnson ignored it and continued to the restroom.

64.    Mr. Johnson left the restroom and made his way back to his table. When he crossed through the courtyard, he passed by an adult who was apparently supervising the prom group.

65.    Mr. Johnson briefly asked the adult, "Do you think it would be possible to ask your group to tone it down a bit?" The adult responded, "They're just kids having fun," and she waved Mr. Johnson off with her hand.

66.    Dalton Stevens, one of the teenagers in the group, overheard Mr. Johnson's brief conversation with the adult. Stevens was wearing a red prom dress and was there with his boyfriend, Jacob Geittmann.

67.    Stevens and Geittmann instigated a confrontation with Mr. Johnson by verbally attacking, berating, and heckling Mr. Johnson. At the same time, Geittmann started recording Mr. Johnson on his cell phone.

68.    Instead of engaging in argument with the teenagers, Mr. Johnson started walking away, trying to get back towards his table at the restaurant.

69.    The teenagers, including Stevens and Geittmann, continued to verbally attack and berate Mr. Johnson, moving themselves toward the door that Mr. Johnson needed to use to return to his table.

70.    As Mr. Johnson was trying to get back to his dinner table, the prom group continued to address him, and Mr. Johnson turned towards the chaperones to respectfully hear them out, before returning to his table.

71.    Geittmann was videotaping the brief encounter between Mr. Johnson and Stevens while at the same time participating in the verbal harassment, seeking agreement

12

to random statements designed by Geittmann to sound "homophobic." This videotape is what became the Video Clip.

72.     At one point, Geittmann, while he was filming, got so close to Mr. Johnson that Geittmann made contact with Mr. Johnson's right shoulder. Mr. Johnson reflexively moved his shoulder and arm to avoid further contact with Geittmann.

73.     Mr. Johnson was eventually able to return to his table.

74.     Mr. Johnson and his group, seeing no end to the shouting and profanities, left the Harpeth Hotel to find a quiet location to have dinner.

75.     During the entirety of the April 24 Incident, Mr. Johnson never expressed any anger, raised his voice, or threatened the prom group in any way, even though the promgoers emotions were visible and extreme.

## F.     MS. GRIFFIN OPENS THE DIGITAL FLOODGATES TO THE VIDEO CLIP AND EMBARKS ON A MALICIOUS CAMPAIGN TO TERMINATE MR. JOHNSON'S EMPLOYMENT CONTRACT

76.     Geittmann published the Video Clip to his personal TikTok account on or about April 24, 2021.

77.     Shortly thereafter, TikTok removed the Clip from its service and did not allow Geittmann to republish it. However, before TikTok removed the Clip, it was downloaded and mirrored to other devices and social media services, including Twitter, Reddit, and LinkedIn.

78.     On or about April 25, 2021, Geittmann published two additional videos to his TikTok account. These videos will be referred to herein as "Geittmann's Part One" and "Geittmann's Part Two."  In Geittmann's Part One, he admits that TikTok removed the Clip from its service and did not allow him to republish it:

This [is] a long story; probably gonna [sic] have to make multiple parts, but I'm in college, my boyfriend's a senior in high school, and he decided that he wanted to wear a dress for his senior prom to kinda [sic] break the stigma around men wearing dresses. He looked gorgeous, everybody loved it, nobody had a problem with it, right?

We went to this hotel close to where we lived, and we got a lot of good photos, we were there for about an hour and right as we were about to leave we were standing outside in this little middle area with a bunch of buildings surrounding us. This man comes up, stands about an inch behind my boyfriend and he's like "what are you wearing?" And he's like, "a dress, why?" And he's like, "well why are you wearing that you shouldn't be wearing that." And he's like, "I can and I want to and I really don't give a fuck what you think."

So this man starts going on and on, throwing insults at [Stevens], "you look disgusting," "you look like an idiot," "men shouldn't be wearing this," all of this homophobic banter.

So I grab my phone to start to record because I knew I wanted to record this shit from the get go, so I grab my phone, start to record, he slaps my phone out of my hand and [it] goes flying over on the concrete.

In Geittmann's Part Two, he states:

So he hits my phone out of my hand, it goes flying on the concrete. I go to grab it to start recording him again, and he tries to swing at me again which you can see in the original video, the camera goes out for a second, you can see him swinging. He tries to hit my phone out of my hand again but he misses and he hits my boyfriend in the back.

So that's when all of the moms that were there, they're getting really involved now, they're like, "you need to calm down, like this is absolutely ridiculous, you are out of your mind."

At this point the hotel staff had gotten word from inside about what was going on. So two other ladies come out and they're like, "okay guys, what's going on out here." He pretends like he has absolutely no clue what's going on. He's standing there, he's like "I've just been standing here the

14

whole time, I don't know what's going on, I didn't try to talk to them, I didn't hit him, I didn't try to smack his phone out of his hand." I'm like, "dude, I have a minute long video of you harassing us, you can't just blatantly deny it like that."

The staff was really great about everything, they sent him back to the bar because he was pretty obviously drunk, just cause they were calling the police and they didn't want him to freak out more than he already was.

And as we were leaving they told us they were kicking him out and calling the police, so, I guess it's a win.

79.     Geittmann's narrative is deeply misleading and is only one side of the story of the April 24 Incident.

80.     The Clip had limited public exposure between April 24 and April 25, 2021.

81.     The Clip did not reach mainstream prominence or "go viral" until the early morning hours of April 26, 2021, when Ms. Griffin republished the Clip in her first tweet about the April 24 Incident. In her first tweet, along with the Clip, Griffin stated: "If this is Sam Johnson in Nashville, Tennessee, the CEO of @VisuWell, healthcare-tech-growth strategist, married to Jill Johnson where they may reside in Franklin, Tennessee, it seems like he's dying to be online famous." Ms. Griffin's first tweet remains online and can be viewed by the Court at: https://twitter.com/kathygriffin/status/13865569 94560020481?s=20 (last visited April 20, 2022). A true and correct copy of Ms. Griffin's first tweet is attached and incorporated by reference as ***Exhibit B*** and is reprinted below for the Court's convenience:



Kathy Griffin ✔
@kathygriffin

If this is Sam Johnson in Nashville, Tennessee, the CEO of @VisuWell, healthcare-tech-growth strategist, married to Jill Johnson where they may reside in Franklin, Tennessee, it seems like he's dying to be online famous. 🙆‍♀️🏳️‍🌈🙆‍♀️

Fifty Shades of Whey @davenewworld_2 · Apr 25
Homophobic POS in Tennessee harasses a teenager for wearing a dress to prom
Show this thread

▶ 1.7M views                                    0:00 / 0:59 🔊 ⤢

1:45 AM · Apr 26, 2021 · Twitter for iPad

3,909 Retweets    532 Quote Tweets    10.3K Likes

82.     Kathy Griffin has over two million followers on Twitter. Griffin's followers quickly spread her first tweet across the internet and provided their own commentary. Some of them wrote, "why is he creeping on kids in their prom dresses,"[2] and "woah… [sic] how

does [Mr. Johnson] disturb kids going to prom? Glad the kid was able to stand proud but they shouldn't have to encounter bullies on prom day or ever! @glaad."[3] The first tweet containing the Clip that Ms. Griffin republished, from an account titled "Fifty Shades of Whey," was captioned, "Homophobic POS [piece of shit] in Tennessee harasses a teenager for wearing a dress to prom."

83.     It was Ms. Griffin's first tweet that caused the Video Clip and April 24 Incident to go viral. Hours after Ms. Griffin published her first tweet, Ms. Griffin directly replied to a tweet from Geittmann wherein he expressed elation. "KATHY (emojis omitted) when I posted this I did NOT expect it to go viral to this extent but THANK YOU SO MUCH" and Ms. Griffin replied: "Jacob, I'm so sorry you had to be anywhere near this thing. I was very anxious for you while watching, but am grateful you took the video (as is your right.) I'm proud to be any ally. Let me know if there's anything I can do to help. (emojis omitted)". These tweets remain online and be accessed at https://twitter.com/kathygriffin/status/1386579576264921089?s=20&t=F3o7fF0EOupCj2 HQ5Oer3gA (last visited April 20, 2022) and https://twitter.com/jacob geittmann2/status/1386577923226865664?s=20&t=F3o7fF0EOupCj2HQ5Oer3g (last visited April 20, 2022). True and correct copies of these tweets are attached and incorporated by reference as ***Exhibit C*** and are reprinted below for the Court's convenience:

---

[3] https://twitter.com/LaurenKJoyce/status/1386564275729092609 (last visited August 18, 2021).



84.     Similarly, as a proximate result of Ms. Griffin's first tweet, some of VisuWell's customers, including University Hospitals Health System, Inc. ("UH Cleveland"), took notice of the Video Clip and the April 24 Incident. Indeed, within hours after Ms. Griffin's first tweet was published, on April 26, 2021, UH Cleveland published a series of three tweets from its official Twitter account, condemning Mr. Johnson and promising that it would "evaluate" its business relationship with VisuWell:

> University Hospitals is shocked and disturbed by the recent video of VisuWell's Chief Executive Officer, which is inconsistent with our values of diversity, equity and inclusion. UH has long supported the medical, emotional and social needs of LGBTQIA+ patients, and those (1/3)[4]
>
> ***
>
> who are questioning and/or exploring their identity. UH's LGBTQIA+ provider care team offers innovative gender and sexual diversity services in Northeast Ohio. In light of this

---

[4] https://twitter.com/UHhospitals/status/1386780499339841542?s=20 (last visited August 18, 2021).

recent event, we are evaluating our business relationship with VisuWell, but regardless will (2/3)[5]

\*\*\*

continue to meet the needs of our patients in Northeast Ohio. (3/3)[6]

UH Cleveland's tweets and its actions relating thereto are the subject of another pending case in this Court, which is captioned *Johnson v. University Hospital Health System, Inc.,* Case No. 3:21-cv-00656.

85.     Other VisuWell customers such as the University of Arkansas for Medical Sciences ("UAMS") replied directly to Ms. Griffin's first tweet on April 26, 2021, condemning Mr. Johnson's purported behavior and stating that it had "spoken to members of the VisuWell executive leadership team…." This tweet is still available online and be accessed at the following link: https://twitter.com/uamshealth/status/1386789386 214387715?s=20&t=Mr6k6WNszqd1WL8eTIXGcQ (last visited April 21, 2022). A true and correct copy of this tweet is attached and hereby incorporated by reference as ***Exhibit D*** and is reprinted below for the Court's convenience:

---

[5] https://twitter.com/UHhospitals/status/1386780501265068039?s=20 (last visited August 18, 2021).
[6] https://twitter.com/UHhospitals/status/1386780503525703681?s=20 (last visited August 18, 2021).

19



86.     Hours after Ms. Griffin published her first tweet on April 26, 2021, she published another tweet attaching two images of Mr. Johnson's face and writing: "Who is? THIS (sic) Sam Johnson of Franklin Tennessee (sic)?" That tweet remains online and can be viewed by the Court at: https://twitter.com/kathygriffin/status/138670082137

5512580?s=20&t=2fHAGNbdPBFBYI_iWdFydQ (last visited April 21, 2022). A true and correct copy of that tweet is attached and hereby incorporated by reference as ***Exhibit E***.

87.     VisuWell did not publicly comment on the April 24 Incident until hours after Ms. Griffin published her first tweet on April 26, 2021. Just after 6:00 p.m. on April 26, 2021, VisuWell published the first of four tweets via its official Twitter account, @VisuWell, which stated: "Post 1/4: We unequivocally condemn the behavior exhibited by Sam Johnson in a recent video widely circulated on social media."  This tweet is still available online and can be accessed by the Court at: https://twitter.com/VisuWell/status/1386803894353793025?s=20&t=HLcamLe1KVmyei psjfECZg (last visited April 21, 2022). A true and correct copy of VisuWell's four tweets are attached and incorporated by reference as ***Exhibit F***, the first of which is reprinted below for the Court's convenience:



88.     The second of VisuWell's series of four tweets announced that it was terminating Mr. Johnson as its CEO: "After investigating the matter and speaking to individuals involved, the VisuWell BOD has chosen to terminate Mr. Johnson from his position as CEO, effective immediately."

89.     In response to the second of the four tweets published by VisuWell, outlined in the above paragraph, Ms. Griffin published another tweet on the evening of April 26, 2021 about the April 24 Incident, warning VisuWell that her followers will "remain vigilant" and directly asking VisuWell: "Has Sam Johnson has (sic) been removed from his position on the Board of Directors and, if not, what measures is Visuwell (sic) taking in this regard? Leaving Johnson on the Board raises an eyebrow that the company intends to rehire. Know the nation will remain vigilant."



90.     Within minutes after the above tweet was published, VisuWell replied directly to Ms. Griffin, stating simply: "terminated." VisuWell's tweet remains online and can be viewed by the Court at: https://twitter.com/VisuWell/statu s/1386845538688110593?s=20&t=Ja1doLzRy2d2K5rQ8MImZQ (last visited April 20,

2022). A true and correct copy of that tweet is attached and incorporated by reference as *Exhibit G* and is reprinted below for the Court's convenience:



91.     The next day, on April 27, 2021, VisuWell published several other tweets clarifying that "Mr. Johnson is no longer employed by VisuWell in any capacity."

92.     VisuWell eventually published two reply tweets to Ms. Griffin's first tweet on April 26, 2021, which caused the Clip to go viral. In its first reply to Ms. Griffin, VisuWell stated: "terminated. confirmed." In its second reply to Ms. Griffin, VisuWell stated: "terminated."  These tweets are still available online and can be accessed by the Court at:  https://twitter.com/VisuWell/status/1387100586026405901?s=20&t=9r5cOE vB0YfTQ-vh6T9bWw (last visited April 21, 2022) and https://twitter.com/VisuWell /status/1387100877966790660?s=20&t=9r5cOEvB0YfTQ-vh6T9bWw (last visited April 21, 2022), respectively. True and correct copies of these tweets are attached and

incorporated by reference as ***Exhibit H*** and are reprinted below for the Court's convenience:





93. On April 27, 2021, in response to VisuWell's announcement that Mr. Johnson was not employed with VisuWell "in any capacity," Ms. Griffin's followers expressed joy, one of whom copied Ms. Griffin on their message stating, "@kathygriffin we did it!!!" That tweet is still available online and can be accessed by the Court at: https://twitter.com/Daniek1992/status/1387089271744471041?s=20&t=esHXhAAJ4K-PfLs2tryTKg (last visited April 21, 2022). A true and correct copy of that tweet is attached and incorporated by reference as ***Exhibit I*** and is reprinted below for the Court's convenience:



94.     VisuWell officially terminated Mr. Johnson's employment contract on April 26, 2021. Such termination constituted, under the terms of the employment contract, a breach of contract. VisuWell ceased all employment relations with Mr. Johnson on or about April 26, 2021.

95.     But for Ms. Griffin's first tweet on April 26, 2021, the Video Clip and the April 24 Incident would not have gone viral on the internet. The Video Clip and the April 24 Incident would have been quickly forgotten and would not have been used by VisuWell as a basis to terminate Mr. Johnson's employment contract.

96.     Indeed, on or about April 25, 2021, the day after the Video Clip was published to the internet but the day before Ms. Griffin published her first tweet, VisuWell's Chairman of the Board of Directors called Mr. Johnson to ask him about the Video Clip. During this conversation, Mr. Johnson asked the Chairman whether VisuWell had any plans to take action against him. The Chairman told Mr. Johnson that VisuWell had no plans to terminate Mr. Johnson and would stand by him despite the social media

25

publication of the Video Clip. The day after Mr. Johnson's conversation with the Chairman, Ms. Griffin published her first tweet and called on her followers and the public at large to pressure VisuWell into terminating Mr. Johnson. Ms. Griffin played an active and substantial part in the breach of the employment contract between Mr. Johnson and VisuWell.

97.     Ms. Griffin greatly contributed to the effort to have Mr. Johnson "cancelled" through termination of his employment contract with VisuWell. Harangued by Griffin's social media followers, VisuWell terminated Johnson without any required investigation into the April 24 Incident. Ms. Griffin was the leader of the concerted effort to cancel Mr. Johnson. Indeed, Ms. Griffin's first tweet on April 26, 2021 was a call to action—copying VisuWell directly on the first tweet and asking her followers to make Mr. and Mrs. Johnson "online famous."

98.     Geittmann later admitted, in another video he published on his TikTok account on July 19, 2021, that an investigation into the April 24 Incident should have occurred prior to Mr. Johnson being fired. Geittmann stated, in relevant part:

> … me and Dalton both agreed that VisuWell, the company that he was the CEO of, should have done a more, you know, thorough and formal investigation and then made a decision whether or not to fire [Mr. Johnson] based on the evidence that we presented.

## G.     MS. GRIFFIN'S OUTRAGEOUS ACTIONS CAUSED MR. AND MRS. JOHNSON TO SUFFER SEVERE EMOTIONAL DISTRESS, MENTAL ANGUISH, AND PERPETUAL REPUTATIONAL HARM

99.     Ms. Griffin's actions inflicted severe emotional distress, mental anguish, and reputational injury upon Mr. Johnson, including but not limited to embarrassment, psychic injury and psychological pain and suffering, loss of the respect and affection of his friends and business colleagues, loss of the respect and affection of those with whom he

26

serves on boards and commissions, and loss of the good reputation he developed over his many years of community leadership. Mr. Johnson suffered personal physical injury and physical sickness as a result of Ms. Griffin's actions.

100.    Ms. Griffin's actions also caused Mrs. Johnson to suffer severe emotional distress, mental anguish, and reputational injury, including but not limited to embarrassment, psychic injury and psychological pain and suffering, loss of the respect and affection of her friends and business colleagues, and loss of the good reputation she developed over the many years of her community leadership. Mrs. Johnson suffered personal physical injury and physical sickness as a result of Ms. Griffin's actions.

101.    Mr. and Mrs. Johnson, as well as Mrs. Johnson's business Storehouse No.9, received countless online threats—including threats of rape and death—as a foreseeable and proximate result of Ms. Griffin's call-to-action to make Mr. and Mrs. Johnson "online famous." Complete strangers repeatedly called, texted, and tweeted threats directly to Mr. and Mrs. Johnson. Some of these threats are compiled in an exhibit which is attached hereto and hereby incorporated by reference as ***Exhibit J***.

102.    Ms. Griffin's actions directly, and as a substantial factor, caused all of these threats to be lodged against the Plaintiffs. It was foreseeable that, by naming Mrs. Johnson in her first tweet on April 26, 2021, Ms. Griffin's followers and other users would further dox, harass, and stalk Mrs. Johnson and publish the name of and attack her business.

103.    Mrs. Johnson's business suffered lost profits and other damages as a result of Ms. Griffin's conduct.

104.     Ms. Griffin published Mr. and Mrs. Johnson's name and the city in which they live maliciously, knowingly, and with the sole purpose of causing them injury, based on an obviously incomplete, edited, and out-of-context video clip.

105.     Ms. Griffin's conduct, specifically telling her followers and the internet at large to make Mr. and Mrs. Johnson "online famous," is violative of Tennessee's criminal harassment statute, Tenn. Code 39-17-308, and Tennessee's criminal stalking statute, Tenn. Code 39-17-315.

106.     Ms. Griffin engaged in a willful course of conduct involving repeated and continuing harassment of Mr. and Mrs. Johnson that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, and molested. Because of Ms. Griffin's conduct, Mr. and Mrs. Johnson actually felt terrorized, frightened, intimidated, threatened, harassed, and molested.

## CAUSES OF ACTION

### Count 1—Tortious Interference with Employment Relations
**(Mr. Johnson against Ms. Griffin)**

107.     The Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

108.     An employment relationship existed between Mr. Johnson and VisuWell.

109.     Ms. Griffin knew and was otherwise aware of the employment relationship between Mr. Johnson and VisuWell.

110.     Ms. Griffin knew that Mr. Johnson was the CEO of VisuWell.

111.     Ms. Griffin was an "outsider" to Mr. Johnson and VisuWell's employment relationship. Ms. Griffin stood as a third-party to Mr. Johnson's employment relationship with VisuWell.

112.    Ms. Griffin and VisuWell do not and did not have unified or closely tied interests with respect to Mr. Johnson's continued employment, e.g., there was no unity of ownership, no unity of control over Mr. Johnson, no unity of board members, or no similar common business control or ownership arrangements.

113.    Ms. Griffin, among other things, intentionally engaged in online harassment of Mr. and Mrs. Johnson by calling upon her followers and other users to make them "online famous," which amounts to an invasion of privacy and was conduct committed for the sole purpose of causing reputational and emotional injury to Mr. and Mrs. Johnson. Such conduct, on its own, constitutes an independent legal wrong sufficient to establish impropriety and wrongfulness as a matter of law.

114.    Moreover, as previously alleged, Ms. Griffin's conduct is violative of Tennessee's criminal harassment statute, Tenn. Code 39-17-308 and Tennessee's criminal stalking statute, Tenn. Code 39-17-315.

115.    Ms. Griffin intentionally interfered with Mr. Johnson's employment relationship with VisuWell, as previously alleged herein.

116.    Ms. Griffin maliciously, spitefully, and with malevolent intent interfered with Mr. Johnson's employment relationship with VisuWell.

117.    Ms. Griffin's conduct exhibited hatred, ill will, and a spirit of revenge over Mr. Johnson's purported conduct at the April 24 Incident.

118.    Ms. Griffin, as well, exhibited conduct amounting to extremely reckless behavior that revealed a conscious disregard for a great and obvious harm.

119.    Ms. Griffin's interference proximately caused Mr. Johnson to suffer significant injury and other damages.

29

## Count 2—Common Law Tortious Interference with Contractual Relations
### (Mr. Johnson against Ms. Griffin)

120.     Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

121.     Mr. Johnson, as previously alleged, had a valid and enforceable employment contract with VisuWell. A true and correct copy of that employment contract, with irrelevant portions redacted, is attached hereto as ***Exhibit A***.

122.     Ms. Griffin knew about and was otherwise aware of Mr. Johnson's employment contract with VisuWell, as previously alleged herein.

123.     Ms. Griffin, as alleged above, intentionally procured the contract's breach and intended to induce a breach of Mr. Johnson's employment contract with VisuWell.

124.     VisuWell terminated Mr. Johnson's employment contract as a result of Ms. Griffin's conduct.

125.     VisuWell's termination of Mr. Johnson on or about April 26, 2021 constituted a breach of the employment contract between VisuWell and Mr. Johnson.

126.     As alleged throughout this Complaint, Ms. Griffin's intentional interference was improper because she intentionally engaged in online harassment and stalking of Mr. and Mrs. Johnson by calling upon her followers and other Twitter users to form a cybermob to make Mr. and Mrs. Johnson "online famous," which amounts to an invasion of privacy and violation of Tennessee's criminal harassment and stalking statutes. Ms. Griffin's engaged in her course of conduct for the sole purpose of causing reputational and emotional injury to Mr. and Mrs. Johnson.

127.     As a proximate result of Ms. Griffin's conduct, Mr. Johnson suffered severe damages.

## Count 3—Statutory Tortious Interference with Contractual Relations
## Pursuant to Tenn. Code 47-50-109
### (Mr. Johnson against Ms. Griffin)

128.    Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

129.    Mr. Johnson, as previously alleged, had a valid and enforceable employment contract with VisuWell. A true and correct copy of that employment contract, with irrelevant portions redacted, is attached hereto as ***Exhibit A***.

130.    Ms. Griffin knew about and was otherwise aware of Mr. Johnson's employment contract with VisuWell, as previously alleged herein.

131.    Ms. Griffin, as alleged above, intentionally procured the contract's breach and intended to induce a breach of Mr. Johnson's employment contract with VisuWell all in violation of Tenn. Code 47-50-109.

132.    VisuWell terminated Mr. Johnson's employment contract as a result of Ms. Griffin's conduct.

133.    VisuWell's termination of Mr. Johnson on or about April 26, 2021, constituted a breach of the employment contract between VisuWell and Mr. Johnson.

134.    Ms. Griffin's interference was improper and lacked any justification whatsoever.

135.    As a proximate result of Ms. Griffin's conduct, Mr. Johnson suffered severe damages.

## Count 4—Intentional Infliction of Emotional Distress
### (Mr. and Mrs. Johnson against Ms. Griffin)

136.    Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

137.     Ms. Griffin intentionally and recklessly inflicted severe emotional distress upon Mr. and Mrs. Johnson by asking her followers and other Twitter users to make them "online famous."

138.     Knowing the dramatic damage her conduct would cause to Mr. and Mrs. Johnson's reputation, careers, and emotional wellbeing, Ms. Griffin was certain or substantially certain that such distress would result from her conduct.

139.     Ms. Griffin's conduct was extreme and outrageous as to exceed all possible bounds of decency. Ms. Griffin's conduct must be regarded as atrocious and utterly intolerable in a civilized community.

140.     Ms. Griffin's conduct caused Mr. and Mrs. Johnson to suffer severe emotional distress and mental anguish.

141.     The emotional distress suffered by Mr. and Mrs. Johnson is and was so severe that no reasonable person could be expected to endure it.

### Count 5—Invasion of Privacy—Intrusion Upon Seclusion
#### (Mrs. Johnson against Ms. Griffin)

142.     Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

143.     In Tennessee, one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. *Roberts v. Essex Microtel Assocs.*, 46 S.W.3d 205, 210 (Tenn. Ct. App. 2000).

144.     Ms. Griffin, by publishing Mrs. Johnson's name and encouraging her online followers to make Mr. and Mrs. Johnson "online famous," intentionally, substantially, and

32

unreasonably intruded upon the seclusion of Mrs. Johnson in her private marriage and affairs with Mr. Johnson.

145.    Ms. Griffin's intrusion was accomplished through her tweets and by encouraging her followers to dox, harass, and stalk Mr. and Mrs. Johnson and make them "online famous."

146.    Mrs. Johnson was not at the Harpeth Hotel during the April 24 Incident and had nothing to do with April 24 Incident or the Video Clip whatsoever.

147.    The public was not aware of Mrs. Johnson or her existence until Ms. Griffin inexplicably published Mrs. Johnson's name in her first tweet on April 26, 2021.

148.    Ms. Griffin had no reasonable basis or justification for naming Mrs. Johnson and her hometown in her first tweet.

149.    Ms. Griffin named Mrs. Johnson in her first tweet for the sole purpose of harming her reputation and encouraging her followers to attack her marriage with Mr. Johnson.

150.    Mrs. Johnson had an objective and subjective reasonable expectation of privacy in her marriage and could not have reasonably expected to be doxed given that she was not involved with the Video Clip or the April 24 Incident in any capacity whatsoever.

151.    Ms. Griffin's intrusion is and was highly offensive and highly objectionable to reasonable people.

152.    Mrs. Johnson suffered severe emotional distress, mental anguish, and reputational injury as a result of Ms. Griffin's intrusion into her marriage.

## Count 6—Prima Facie Tort
### (Mr. and Mrs. Johnson against Ms. Griffin)

153.    Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

154.    In Tennessee, the intentional infliction of harm without excuse or justification gives rise to a cause of action for prima facie tort. *Hutton v. Watters*, 179 S.W 134 (Tenn. 1915); *Large v. Dick*, 343 S.W.2d 693 (Tenn. 1960).

155.    Ms. Griffin maliciously, malevolently, and intentionally caused harm to Plaintiffs through her conduct alleged herein.

156.    Ms. Griffin engaged in the conduct alleged herein for the sole purpose of causing emotional injury, mental anguish, and reputational injury to Mr. and Mrs. Johnson.

157.    Ms. Griffin lack any privilege, excuse, or justification for her actions.

158.    Ms. Griffin caused Plaintiffs to suffer severe emotional distress, mental anguish, and reputational injury as alleged herein.

## Count 7—Negligence Per Se
### (Mr. and Mrs. Johnson against Ms. Griffin)

159.    Plaintiffs restate and incorporate by reference the above paragraphs as if fully realleged herein.

160.    The standard of conduct expected of a reasonable people in Tennessee is in part set forth in Tennessee's criminal harassment statute, Tenn. Code 39-17-308, and Tennessee's criminal stalking statute, Tenn. Code 39-17-315. Because those statutes provide that under certain circumstances particular acts shall not be done, it may be interpreted as fixing a standard of care from which it is negligence to deviate.

161.    The statutes outlined above were designed to impose duties and prohibit certain acts for the benefit of certain people and the public at large.

34

162.    Mr. and Mrs. Johnson, the injured parties, are within the class of persons that the above statute was meant to protect because they are ordinary private citizens of the State of Tennessee.

163.    Ms. Griffin's conduct violated those sections and greatly deviated from the standard of care and prohibited acts outlined therein.

164.    Ms. Griffin's negligence proximately caused Mr. and Mrs. Johnson to suffer severe emotional distress and mental anguish.

165.    Mr. and Mrs. Johnson's severe emotional distress, mental anguish, and reputational injury are the types of injuries that the above statutes are designed to protect against.

**WHEREFORE**, Plaintiffs respectfully pray:

(a) That judgment be entered against Ms. Griffin for substantial compensatory damages in an amount to be determined at trial;

(b) That Ms. Griffin be held liable for the emotional distress and mental anguish Mr. and Mrs. Johnson has and will suffer;

(c) That judgment be entered against Ms. Griffin for punitive and treble damages in an amount to be determined at trial;

(d) That Mr. Johnson recover all statutory damages permitted by Tenn. Code 47-50-109.

(e) That Plaintiffs recover pre- and post-judgment interest;

(f) That Plaintiffs recover their reasonable attorneys' fees and expenses from Ms. Griffin;

(g) For trial by jury on all issues so triable;

(h) That all costs of this action be taxed to Ms. Griffin; and

(i) That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.

35

Respectfully submitted,


*/s/ Lyndsay Smith*
Lyndsay Smith (Bar No. 024715)
SMITH, PLC
311 22nd Avenue North,
Nashville, Tennessee 37203
Phone: (615) 866-9828
Fax: (615) 866-9863
lsmith@smith-plc.com

Todd V. McMurtry
(*pro hac vice* forthcoming)
J. Will Huber
(*pro hac vice* forthcoming)
HEMMER DEFRANK WESSELS, PLLC
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiffs,*
*Samuel and Jill Johnson*

36