# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| **SAMUEL JOHNSON, in his individual capacity, and JILL JOHNSON, in her individual capacity,** | **Case No. 3:22-cv-00295** |
| **Plaintiffs,** | **Judge William L. Campbell, Jr.** <br> **Magistrate Judge Barbara D. Holmes** |
| **v.** |  |
| **KATHY GRIFFIN, in her individual capacity,** | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| **Defendant.** |  |

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Samuel Johnson ("Mr. Johnson") and his wife Jill Johnson ("Mrs. Johnson") (collectively, "Plaintiffs" or the "Johnsons") reside in Williamson County, Tennessee. (Compl. ¶¶ 33–34). Prior to the actions of the defendant, Kathy Griffin ("Ms. Griffin" or the "Defendant"), Mr. Johnson was the chief executive officer of WeCounsel Solutions, LLC d/b/a VisuWell ("VisuWell"), a rapidly growing company serving the healthcare industry. (*Id.* ¶ 13). Mrs. Johnson is the owner of Storehouse No.9, a family-owned small business in Franklin, Tennessee. (*Id.* ¶ 20).

On the evening of Saturday, April 24, 2021, Mr. Johnson arranged for family dinner at the Harpeth Hotel's 1799 Restaurant in Franklin, Tennessee. (*Id.* ¶ 47). Mrs. Johnson did not attend the dinner because she was out of town. (*Id.* ¶ 48). While waiting for his company to arrive, Mr. Johnson sat in the common area and initiated a conversation with a stranger from out of town. (*Id.* ¶ 50). During their conversation, the two were interrupted several times by loud yelling, cursing, and invasive noise emanating from a large group of teenagers gathering for prom activities in the lobby and restaurant area. (*Id.* ¶ 52). The fracas continued for approximately 45 to 50 minutes and included vulgarities, shouting, profanity, and simulated sex acts. (*Id.* ¶ 54). The hotel staff failed

1

to take any action to address the disturbance. (*Id.* ¶ 61).

Mr. Johnson, after being seated for dinner, eventually went to use the restroom, which required him to walk through the courtyard where the promgoers were standing. (*Id.* ¶ 63). After leaving the restroom, Mr. Johnson made his way back through the courtyard, where the promgoers continued to shout vulgarities and obscenities. (*Id.* ¶¶ 63–64). In the courtyard, Mr. Johnson passed an adult who appeared to be supervising the group. (*Id.* ¶ 64). In passing, Mr. Johnson asked the adult if it would be possible to ask the teenagers to "tone it down a bit." (*Id.* ¶ 65). The adult refused. (*Id.*). One of the teenagers in the group, Dalton Stevens ("Mr. Stevens"), overheard Mr. Johnson's brief conversation with the adult and, together with his boyfriend Jacob Geittmann ("Mr. Geittmann"), instigated a confrontation with Mr. Johnson by verbally berating him. (*Id.* ¶¶ 66–67). Mr. Johnson began to walk away. (*Id.* ¶ 68). Mr. Geittmann began videotaping Mr. Johnson on his cell phone as Mr. Stevens and Mr. Geittman moved to slow Mr. Johnson's exit while verbally berating him. (*Id.* ¶¶ 67, 69). Mr. Johnson never expressed any anger, raised his voice, or threatened Mr. Stevens, Mr. Geittmann, or their group in any way. (*Id.* ¶ 75). Mr. Johnson was eventually able to return to his table. (*Id.* ¶ 73).

Mr. Geittmann subsequently published, on the same day, a short, edited, and out of context video of Mr. Johnson to Mr. Geittmann's TikTok account (the "Video Clip"). (*Id.* ¶ 76). TikTok quickly removed the Video Clip from its service and did not allow Mr. Geittmann to republish it. (*Id.* ¶ 77). However, before it was removed, the Video Clip was downloaded and mirrored to other devices and social media services. (*Id.* ¶ 77). The Video Clip had limited and minimal public exposure between April 24 and April 25, 2021. (*Id.* ¶ 80).

Ms. Griffin caused the Video Clip to "go viral" on April 26, 2021 by republishing it to her two million followers. (*Id.* ¶¶ 81–83). In her first tweet about the incident, Ms. Griffin encouraged her followers to "dox" Mr. and Mrs. Johnson specifically in Tennessee, writing: "If this is Sam

Johnson in Nashville, Tennessee, the CEO of @VisuWell, healthcare-tech-growth strategist, married to Jill Johnson where they may reside in Franklin, Tennessee, it seems like he's dying to be online famous." (*Id.* ¶ 81). Many of Ms. Griffin's followers received her message and commented in support, (*id.* ¶ 82), and many of VisuWell's customers responded directly to Ms. Griffin's first tweet (*id.* ¶¶ 84–85).[1] Mr. Geittmann responded to Ms. Griffin's tweet, thanking her for causing it to go viral. (*Id.* ¶ 83).

Ms. Griffin published multiple follow-up tweets to her first tweet about Mr. and Mrs. Johnson, further attempting to identify them and dox them in Tennessee. (*Id.* ¶ 86). Eventually, hours after Ms. Griffin published her first tweet about the incident, VisuWell publicly commented on the incident for the first time. (*Id.* ¶ 87). Ms. Griffin, in another tweet, again pressured VisuWell to terminate Mr. Johnson. (*Id.* ¶ 89). Minutes later, VisuWell responded directly to Ms. Griffin, stating simply: "terminated." (*Id.* ¶¶ 90). VisuWell eventually published two reply tweets to Ms. Griffin's first tweet, again stating: "terminated. confirmed" and "terminated." (*Id.* ¶¶ 92). VisuWell terminated Mr. Johnson as a proximate result of Ms. Griffin's wrongful conduct. (*Id.* ¶¶ 97, 124, 132). Mr. and Mrs. Johnson suffered severe injury resulting from Ms. Griffin's tweets because the tweets catalyzed a doxing campaign against the Johnsons in their hometown of Franklin. (*Id.* ¶¶ 99–106). Mrs. Johnson, who was out of town during the incident and had nothing to do with it whatsoever, was suddenly attacked by Ms. Griffin's digital mob, who sent threats of rape and death to Mrs. Johnson and her small business in Franklin. (*Id.* ¶¶ 100–106).

Mr. and Mrs. Johnson filed this action on April 25, 2022. (Doc. 1). Ms. Griffin, after waiving service, filed a Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a

---

[1]    In a related proceeding, *Johnson v. University Hospitals Health System, Inc.*, M.D. Tenn. Case No. 3:21-cv-656, Mr. Johnson alleges, consistent with the instant case, that it was Ms. Griffin's first tweet on April 26, 2021 that caused the Video Clip to reach prominence on the internet and that it was in response to Ms. Griffin's tweet that UH Cleveland, the defendant in the related proceeding, first took notice of the Video Clip. *Johnson*, M.D. Tenn. Case No. 3:21-cv-656 (Doc. 1; Page ID# 12–13).

Claim (Doc. 18) (the "Motion") and Memorandum in Support of the Motion (Doc. 19) ("D. Memo") on July 15, 2022. A briefing schedule was set. (Doc. 28). Now, Plaintiffs file this Memorandum in Opposition to Ms. Griffin's Motion to explain why it should be **DENIED**.

## ARGUMENT

### I. MS. GRIFFIN IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN THE STATE OF TENNESSEE

In a career that began as a stand-up comedian, Ms. Griffin has in recent years repeatedly used her social media accounts to "dox" certain individuals, publishing their names, personal addresses, and contact information, and then inflaming her followers to stalk and harass these individuals. (Compl. ¶¶ 24–32).[2] Most notoriously, Ms. Griffin once targeted minor-age school children on the basis of a misleading video that falsely depicted them as confronting a Native American activist. Ms. Griffin tweeted: "Name these kids. I want NAMES. Shame them. If you think these fuckers wouldn't dox you in a heartbeat, think again."[3] (*Id.* ¶ 30). Ms. Griffin got away with her targeting of the children, as she was able to evade personal jurisdiction, having no other connection with that forum state. She cannot evade jurisdiction in Tennessee.

The application of personal jurisdiction in Tennessee over Ms. Griffin is straightforward and constitutionally unassailable. In committing the tort against the Plaintiffs, Ms. Griffin intentionally targeted Tennessee citizens, injuring their reputations and emotional well-being directly and inflaming her Tennessee readers to harass and inflict further injury on the Plaintiffs.

---

[2]   Despite Ms. Griffin's arguments to the contrary (D. Memo. at 3, n. 1), these allegations are relevant to establishing Ms. Griffin's state of mind, motive, and intent, among other things.

[3]   In footnote one to her Memorandum in Support (D. Memo at 3, n. 1), Ms. Griffin insults Mr. and Mrs. Johnson and their counsel, in bold typeface no less, insinuating we have an unstated "improper motive" in bringing this lawsuit. This personal attack is consistent with Ms. Griffin's behavior in other contexts. In fact, neither the Plaintiffs nor their counsel were involved in any prior suits against Ms. Griffin. Describing the Plaintiffs as ill-motived aggressors, when it is Ms. Griffin who inflamed her Twitter mob and sicked it on these quiet Tennessee citizens, stands as an example of victim-shaming of the worst kind.

4

The brunt of the injury from her tortious conduct, indeed all of it, was felt in Tennessee. Ms. Griffin has done business in Tennessee, personally performing her stage act at least twice in this state. These facts more than suffice to support personal jurisdiction. It is not unfair to Ms. Griffin that she be required to answer for her tortious conduct in a Tennessee courtroom.

### A.      Rule 12(b)(2) Legal Standard

When a federal district court rules on a motion to dismiss under Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff. *E.g.*, *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). A court ruling on a Rule 12(b)(2) motion without an evidentiary hearing should not weigh the controverting assertions of the party seeking dismissal because "we want to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *Id.*[4] Dismissal is proper "only if all the specific facts which the plaintiff . . . alleges collectively fail to state a *prima facie* case for jurisdiction." *Id.* The jurisdictional limits of Tennessee law and federal due process are coterminous. *Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019); *First Community Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 384 (Tenn. 2015). Thus, this Court need only determine whether the exercise of personal jurisdiction over Ms. Griffin would violate constitutional due process. *E.g.*, *Payne v. Motorists' Mut. Ins. Companies*, 4 F.3d 452, 455 (6th Cir. 1993).

### B.      Due Process Is Satisfied

The decision of the Supreme Court in *Calder* resolves the matter. *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, a national newspaper published a defamatory article about Shirley Jones,

---

[4]    At this stage in the proceeding, Ms. Griffin's multiple factual assertions should be ignored by the Court. In particular, Ms. Griffin asserts that she "did not travel to, conduct activities in, contact or send something to anyone in Tennessee." (D. Memo. at 11). This assertion is directly contrary to the allegation in the Complaint that Ms. Griffin has on multiple occasions, and at least twice, made personal performance appearances in Nashville. (Compl. ¶ 43).

5

an entertainer and California citizen. *Calder*, 465 U.S. at 784–85. In a suit brought against the reporter and the editor, both non-residents, the Court found jurisdiction was proper because the defendants "expressly aimed" their statements at California and knew that the "brunt of the harm" would be borne there. *Id.* at 789–90. Ms. Griffin in this case did the same. In her first tweet, Ms. Griffin re-published or "re-tweeted" a tweet from a pseudonymous twitter user that contains a video of Mr. Johnson and that referred to him as a "homophobic POS in Tennessee." (Compl. ¶ 81). To her re-tweet, Ms. Griffin added her own statement:

> If this is Sam Johnson in Nashville, Tennessee, the CEO of Visuwell, healthcare-tech-growth strategist, married to Jill Johnson where they may reside in Franklin, Tennessee, it seems like he's dying to be online famous.

(*Id.*). Ms. Griffin has over two million followers on Twitter. (*Id.* ¶ 82). When she re-tweeted this video clip, which until this moment had been lying dormant and unseen in the limitless backwaters of the internet, it went viral. (*Id.* ¶¶ 80–81, 83). In quick order, Ms. Griffin's tweet caused hateful social media backlash and caused Mr. Johnson to be terminated from his employment with a Tennessee company and Mrs. Johnson to suffer devastating effects on her Tennessee business, among other injuries. (*Id.* ¶¶ 99–106). Ms. Griffin's twitter message produced a reply from Mr. Geittmann, a Tennessee resident and one of the youths in the video who had instigated a confrontation with Mr. Johnson at the Harpeth Hotel. (*Id.* ¶¶ 78, 83).[5] Griffin answered Mr. Geittmann's reply, stating, "I'm proud to be an ally. Let me know if there's anything I can do to help." (*Id.* ¶ 83). Ms. Griffin also directed another tweet, where she attached two images of Mr. Johnson and asked: "Who is? THIS Sam Johnson of Franklin Tennessee?" (*Id.* ¶ 86). Subsequently, as if to make sure her malign intentions had been met, Ms. Griffin tweeted a fourth time, now directing her threatened venom at VisuWell, Mr. Johnson's employer:

---

[5] Mr. Geittmann indicated in a subsequent video published to TikTok that he and Mr. Stevens reside close to the Harpeth Hotel in Franklin, Tennessee. (Compl. ¶ 78).

6

> Has Sam Johnson has (sic) been removed from his position on the Board of Directors and, if not, what measures is Visuwell taking in this regard? Leaving Johnson on the Board raises an eyebrow that the company intends to rehire. Know that the nation will remain vigilant.

(*Id.* ¶ 89).    Minutes later, VisuWell responded directly to Ms. Griffin's threatening tweet. "Terminated. Confirmed." said the reply. (*Id.* ¶¶ 90, 92).

Ms. Griffin's tweets make it clear that she "expressly aimed" her statements at Tennessee. The first tweet repeatedly references locations within Tennessee, naming Nashville and Franklin explicitly. It also is expressly aimed at Mr. Johnson and Mrs. Johnson, both Tennessee residents, and at VisuWell, a company with its principal place of business in Tennessee. The video she "re-tweeted" depicts events that took place at the Harpeth Hotel in Franklin. Ms. Griffin's offer to help Mr. Geittmann is an offer to help him where he lives, in Tennessee, either by her presence or by additional actions that might help his situation in Tennessee. Ms. Griffin's subsequent tweet, where she threatened to "raise an eyebrow" should VisuWell not follow its termination of Mr. Johnson by also removing him from the board, makes clear that Ms. Griffin was very deliberate and purposeful in directing or "expressly aiming" her tortious conduct at Tennessee.

Ms. Griffin claims that these "three isolated tweets" form "the only basis" for jurisdiction. (D. Memo. at 5). First, in obvious fact, these tweets are not "isolated": they all refer to the same incident and follow up on each other. By their very words Ms. Griffin checks back to make sure her threats and doxing had their intended effect on Mr. Johnson's career. Second, as the Complaint makes clear, repeatedly, these tweets do not form the "only basis" for jurisdiction; as the Complaint alleges, Ms. Griffin has derived substantial revenue from her provision of services in Tennessee. Adding adjectives like "isolated" to the pled facts of the case does not comprise persuasive legal argumentation.

The second prong established in *Calder*, that the "brunt of the harm" be felt in Tennessee, is also met. Mr. and Mrs. Johnson are members of the local business community in Franklin. They

do not have business or personal reputations or employment or business interests that exceed that local community. Consequently, there can be only one place where the "brunt," or in this matter, actually all of the harm would be borne: Franklin, Tennessee. Ms. Griffin made it a point to identify Plaintiffs' local community to ensure maximum effect, singling out their place of residence. Ms. Griffin's tweets also took dead aim at Mr. Johnson's place of employment, obviously intending to affect Mr. Johnson's job status with the Tennessee company. In addition, as Ms. Griffin knew or should have known, Mr. Geittmann is a resident of Tennessee. (Compl. ¶¶ 78, 83). Her offer to "help" Mr. Geittmann only deepens her contacts with Tennessee. She knew her damaging and tortious statements would cause "the brunt of the harm" within this state.

### 1.    The *Calder* Test Remains Good Law

*Calder's* "effects test" remains the constitutional touchstone for personal jurisdiction in cases involving intentional torts by nonresident defendants. "In [the Sixth] circuit, '[w]hen the actual content of the communications into the forum gives rise to an intentional tort action, that alone *may* constitute purposeful availment. It is the *quality* of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'" *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (italics in original), *quoted in Bd. of Forensic Document Examiners, Inc. v. ABA*, No. 16-cv-2641, 2017 U.S. Dist. LEXIS 18806, at *25 (W.D. Tenn. Feb. 9, 2017) ("The Sixth Circuit's ultimate determination for personal jurisdiction in intentional tort actions, however, also considers the "effects" test elements."); *see also Koch v. Local 438, United Autoworkers Union*, 54 Fed. App'x 807, 812 (6th Cir. 2002) (finding personal jurisdiction over defendant who knew plaintiff's professional reputation centered in Tennessee, whose out-of-state statements led to an executive board's decision to take adverse action against the plaintiff, and whose actions intended to affect plaintiff in Tennessee).

Ms. Griffin asserts that *Calder* has been "narrowed" by a subsequent Supreme Court

opinion and by lower federal court decisions. The Supreme Court decision to which Ms. Griffin cites, however, does not support that conclusion. In *Walden v. Fiore*, 571 U.S. 277 (2014), the Court faithfully applied what *Calder* implicitly held: that *Calder*'s requirement that the forum state be the locus for the "brunt of the harm" requires more than a "mere injury." This reasoning, that "brunt" requires more than "mere," is consistent with *Calder*. Ms. Griffin's tweets unmistakably caused adverse effects in the only place they possibly could, Tennessee, where the Plaintiffs live and do business. Not only did Tennessee feel the "brunt" of the damage; it felt nearly all of it.

## 2. The Sixth Circuit Has Not Modified Supreme Court Precedent

Ms. Griffin also argues that lower federal courts, including the Sixth Circuit, have changed or modified the *Calder* elements. This contention would undoubtedly surprise the Sixth Circuit, which patently understands itself as following *Calder* faithfully. In *Blessing v. Chandrasekhar*, 988 F.3d 889 (6th Cir. 2021), the circuit court reasoned that a general tweet "not specifically directed to a forum state" but instead aimed at national or international audiences does not by itself satisfy the first of *Calder*'s two prongs. This holding is consistent with *Calder*'s requirement that the communication "expressly aim" at the forum state.

Like *Calder* and its progeny, simply posting comments on a social media site does not, "without more," subject the poster to personal jurisdiction wherever the post could be read or the subject of the post might reside. *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011). What "more" courts look for has become clear. "[I]n considering what 'more' could create personal jurisdiction [for posting tortious statements on social media], courts look to indications that a defendant deliberately directed its message to an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* Indeed, all of the relevant Sixth Circuit precedent is entirely consistent with *Calder* and *Walden*; the decisions where the Sixth Circuit finds no jurisdiction do not involve defendants who "expressly aimed" their tortious

9

conduct at the forum state. *See Reynolds v. International Amateur Athletic Federation*, 23 F.3d 1110, 1114 (6th Cir. 1994) (finding no Ohio jurisdiction over London-based association because the press release about the plaintiff "concerned the plaintiff's activities while abroad," the drug sample was "taken and tested abroad," the plaintiff was an international athlete whose professional reputation was not centered in Ohio, the defendant did not publish or circulate the report in Ohio, and Ohio was not the "focal point" of the report"), *quoted in Blessing*, 988 F.3d at 905; *Cadle Co. v. Schlichtmann*, 123 Fed. App'x 675, 679 (6th Cir. 2005) (finding no jurisdiction where publication about Ohio resident did not concern the plaintiff's Ohio activities, and was not specifically targeted or even directed at Ohio readers), *quoted in Blessing*, 988 F.3d at 905.

Ms. Griffin's tweet was specifically directed to Tennessee. She singled out local citizens and a local company, by name, and specified her call to action in Nashville and Franklin, Tennessee. Tweets and other social media statements are not immune from tort liability just because they can be accessed from anywhere. A tweet can be "expressly aimed" at a forum, just as can any other published statement. *See Calder*, 465 U.S. at 789–90. Griffin's tweet was directed specifically at people and businesses and called followers to action in particular locations in Tennessee. She expressly directed her statements to the forum state.

### 3.     General Due Process is Satisfied

Although *Calder* provides the constitutional standard for intentional torts, the more general requirements of due process are also satisfied in this case. The Sixth Circuit has established a three-part test to determine if an assertion of specific jurisdiction is consistent with the due process clause. First, the defendant must purposely avail itself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of

10

jurisdiction over the defendant reasonable. *S. Mach. Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968); *Harmer v. Colom*, 650 Fed. App'x 267, 272 (6th Cir. 1968); *Hardaway v. Quince Nursing and Rehab. Ctr., LLC*, No. 2:19-cv-2464, 2020 U.S. Dist. LEXIS 127277, at *11 (W.D. Tenn. July 20, 2020). By her explicit and stated aim of injuring Plaintiffs in Tennessee, Ms. Griffin has purposely "caused a consequence" in Tennessee. This suit arises directly from Ms. Griffin's tortious conduct aimed at Tennessee citizens and businesses.

The decision in *Santoni v. Mueller*, No. 3:20-cv-00975, 2022 U.S. Dist. LEXIS 4336 (M.D. Tenn. Jan. 10, 2022) provides a compelling comparison. In *Santoni*, a resident of Arizona contacted several Tennessee businesses by tweets and emails in an effort to convince them to stop doing business or breach their contracts with the plaintiff, a Tennessee resident. *Id.* at *2–3. The defendant also contacted plaintiff's friends and family by posting to their social media and using private messaging. *Id.* The defendant was successful in inducing several breaches of contract. *Id.* In ruling on defendant's motion to dismiss for lack of personal jurisdiction, the court held that, where a nonresident defendant wrote tweets and sent emails about a Tennessee-based plaintiff, and the content of the communications gave rise to an intentional tort action, "that alone may constitute purposeful availment," *Id.* at *15 (quoting *Neal*, 270 F.3d at 332); *see also Mark Hanby Ministries, Inc. v. Lubet*, No. 1:06-CV-114, 2007 U.S. Dist. LEXIS 24361, at *22 (E.D. Tenn. March 30, 2007) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) ("[A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity in the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.")).

Personal jurisdiction here is reasonable and satisfies federal constitutional standards.

> In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the

> plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy.

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549, 554–55 (6th Cir. 2007), *quoted in Hardaway*, 2020 U.S. Dist. LEXIS 127277, at *16–17. Griffin presents no circumstances that would render jurisdiction over her unreasonable or burdensome. She has physically been present in the state, providing remunerative services on at least two occasions. She purposely availed herself of this state when she intentionally inflicted harm on Tennessee citizens, and directed her tortious tweets at specific locations within Tennessee. "Tennessee has interests in resolving this case, not the least of which is to provide a forum for the adjudication of a dispute between a resident and a nonresident that has purposefully availed itself of acting in and causing consequences in Tennessee." *Third Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1092 (6th Cir. 1989), *quoted in Hardaway*, 2020 U.S. Dist. LEXIS 127277, at *17. The Plaintiffs in this case have satisfied their "relatively slight" burden to establish personal jurisdiction. *Air Prods.*, 503 F.3d at 549.

### 4.    Tennessee's Long-Arm Statute Is Satisfied

Although Tennessee law counsels that the constitutional due process analysis is dispositive, Tennessee's long-arm statute is also satisfied. In Tennessee, specific jurisdiction under the long-arm statute can be extended to a defendant who causes "tortious injury in this state by an act or omission outside the state." Tenn. Code Ann. § 20-2-223(a)(4). To meet this requirement, the defendant must either (1) "regularly do[] or solicit[] business, or (2) "engage in any other persistent course of conduct," or (3) derive substantial revenue from goods used or consumed or services rendered" in this state. *Id.* The Complaint alleges that Ms. Griffin has repeatedly "derived substantial revenue" from "services rendered" in Tennessee, alleging that she has engaged in multiple "live performances" in Tennessee, including at least two in Nashville. (Compl. ¶ 43). This Court can take judicial notice that she was compensated for her live performances and that her

12

compensation was "substantial." *See generally RegenLab USA, LLC v. Estar Technologies Ltd.*, 335 F. Supp. 3d 526, 538 (S.D.N.Y. 2018) ("No specific dollar threshold is required for the revenue to be deemed substantial."); *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 495 (E.D. Va. 2003) ("Although no court has established an absolute dollar amount that satisfies the 'substantial revenue' requirement, courts have generally found that the amount must exceed $300.") (internal citations omitted). Ms. Griffin argues, without citation, that "only two" performances is for some reason not enough to satisfy the statute. Yet this revenue undoubtedly exceeds $300 and was "direct revenue." *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980) (holding indirect or collateral revenue will not ordinarily suffice to support jurisdiction). Ms. Griffin earned the revenue directly, in person, and not through any subsidiary or collateral source.

Despite Ms. Griffin's repeated citations and assertions, the decision in *Blessing v. Chandrasekhar*, 988 F.3d 889 (6th Cir. 2021) does not militate in favor of a different conclusion. *Blessing* was not a close case; the court found the defendants' conduct to be "plainly outside the scope" of the Kentucky's longarm statute. KRS § 454.210(2)(a)(4) extends jurisdiction to tortious acts committed outside the Commonwealth only if the defendants "regularly do business or 'engage [] in any other persistent course of conduct' in Kentucky." Tennessee's long-arm statute is different and more extensive; it does not limit jurisdiction solely to those nonresidents who conduct "regular business" in the state. Tennessee's long-arm statute also confers jurisdiction over nonresident defendants "who derive substantial revenue from goods used or consumed or services rendered" in Tennessee. No provision of this nature is included in the Kentucky statute at issue in *Blessing*. As pled in the Complaint, Ms. Griffin has in fact derived "substantial revenue" from Tennessee.  (Compl. ¶ 43).

## II. THE COMPLAINT STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A. Rule 12(b)(6) Legal Standard

On a motion to dismiss, this Court must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true. *E.g.*, *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). A complaint requires only a short and plain statement of the claim showing that the pleader is entitled to relief. *E.g.*, *id.* (citing Fed. R. Civ. P. 8(a)(2)). Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Factual allegations must be enough to raise a right to relief above the speculative level, but the complaint need raise only a plausible claim for relief, not a probable claim for relief. *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012) (discussing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quoting *Twombly*, 550 U.S. at 556). At bottom, determining whether a complaint states a plausible claim for relief is a "context specific task" that requires the reviewing court to "draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. The First Amendment Is Not a Defense to this Tort Suit

The Defendant concedes, in one of her many footnotes (D. Memo at n. 2), that Plaintiffs are not suing her for defamation. Consequently, as Ms. Griffin also concedes, Plaintiffs need not allege that Ms. Griffin's tweets were false, or that they constituted statements of fact, or that they were defamatory in content. Nonetheless, Ms. Griffin cites repeatedly to defamation defenses and requirements that do not apply to this case. Most significant among these is the claim that the First Amendment stands as a bar to every one of Plaintiffs' causes of action for intentional tortious conduct.

14

Ms. Griffin's argument proves far too much. Ms. Griffin reads the First Amendment as prohibiting claims for tortious interference, intentional infliction of emotional distress, invasion of privacy, and other torts. Most of these tort actions have been prevalent in Anglo-American jurisprudence for centuries; they are recognized in every state, have appeared in multiple Restatements, and even are enshrined in statutes. Ms. Griffin presents what is truly an ahistorical argument that, if followed, would effectively negate a substantial branch of tort law. Even more, Ms. Griffin's position essentially renders unconstitutional Tennessee's statute on tortious interference, Tenn. Code Ann. § 47-50-109.

Ms. Griffin's restated paeans to the virtues of free speech do nothing to suggest any limits to her argument. Her legal position would render nugatory Tennessee's expansive jurisprudence on tortious interference claims, both at common law and statutory. *See* Steven W. Feldman, *Tortious Interference with Contract in Tennessee: A Practitioner's Guide*, 31 U. Mem. L. Rev. 281 (2001). It would render nugatory the explicit and long-standing determination by the Tennessee Supreme Court that Tennessee's tortious interference statute does not deny the right of free speech under the First Amendment, nor violate any other constitutional right. *Howard v. Haven*, 281 S.W.2d 480 (Tenn. 1955). Many torts, including especially tortious interference, intentional infliction of emotional distress ("IIED"), and invasion of privacy, all involve "speech" in some form or another. Ms. Griffin paints with far too broad a brush to simply cite to the First Amendment, extol the virtues of freedom, and then claim that the constitution prohibits all intentional torts based on speech.

Although Ms. Griffin does not provide one, courts have carefully defined the contours and limits of the First Amendment defense for torts based on speech. The First Amendment provides a defense or "privilege" to speech-based torts only where the cause of action is based on "false and defamatory speech." *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 161 (Tenn. Ct. App. 1997)

(in action for defamation and tortious interference, constitutional privilege applies to both claims); *Lann v. Third National Bank*, 277 S.W.2d 439, 444 (Tenn. 1955) (constitutional defense applied in suit for slander of property and for business duress "based alike on said alleged false and defamatory matter"). Courts from other states have drawn the same line. *Middlesex Concrete Products & Excavating Corp. v. Carteret Industrial Association*, 172 A.2d 22, 25 (N.J. Super. Ct. App. Div. 1961) (statements constitutionally privileged against a suit for defamation could not form the basis for a tortious interference claim); *Western Technologies, Inc. v. Sverdrup & Parcel*, 739 P.2d 1318, 1322–23 (Ariz. 1986) (claim for injurious falsehood was privileged, therefore so was claim for tortious interference). Thus, the First Amendment does not essentially obliterate all of the torts based on speech, including notably tortious interference. The "line" is where those speech-based torts involve "false and defamatory speech." It is in that instance only that courts are to apply the constitutionally derived defenses and requirements pertinent to defamation.

Similarly, only where the plaintiff's case constitutes an attempt to seek reputational damages by circumventing defamation claims do the First Amendment restrictions on tort claims apply. The Court in *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) held that a public figure cannot recover emotional distress damages (IIED) based on speech without satisfying the "actual malice" standard under defamation law. *Falwell*, 485 U.S. at 56. Courts have since held that plaintiffs cannot make an "end run" around defamation law by pleading for defamation-like damages to reputation but naming other torts. *Boladian v. UMG Recordings, Inc.*, 123 Fed. App'x. 165, 169 (6th Cir. 2005) ("Because plaintiffs have failed to show that their defamation claim against defendants was viable, their derivative claim of unjust enrichment against Meijer also fails. A party may not skirt the requirement of defamation law by pleading another, related cause of action."); *Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 857–58 (10th Cir. 1999) (tortious interference claim dismissed where speech would not

sustain a defamation claim); *Zeran v. America Online, Inc.*, 958 F. Supp. 1124, 1133 n. 19 (E.D. Va.) ("To be sure, Zeran is not the first plaintiff to attempt to avoid the strictures of defamation law by disguising a defamation claim as another tort. Courts uniformly reject such attempts."). The issue is whether or not the plaintiff is seeking to avoid defamation restrictions. The court in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) held that *Falwell* does not prevent a plaintiff from asserting non-defamation tort claims under "generally applicable" state law where the plaintiff is seeking non-reputational damages. *Cohen*, 501 U.S. at 669–71 (plaintiff sought damages for a breach of promise that led to job loss and lowered earning capacity).

This line, long established at common law, represents a sound accommodation between tort law and the First Amendment. Torts that are comprised of speech that is "false and defamatory" are factually indistinguishable from defamation and thus are subject to the same constitutional limitations as is a defamation claim. On the other hand, where tortious interference is based on defendant's verbal communication, as most claims of tortious interference must be, but that claim is not based on allegations of "false and defamatory" communications and seeks economic, not reputational, damages, then the First Amendment does not provide a defense or privilege.

Plaintiffs' tort claims against Ms. Griffin do not include any allegations of false and defamatory statements. Ms. Griffin in a footnote concedes this point. The First Amendment is not relevant to this matter. The First Amendment does not, as Ms. Griffin argues, "preclude civil liability for tweets." Ms. Griffin's legal position is startling: she argues that all of these long-recognized Tennessee tort actions, including tortious interference with employment relations, tortious interference with contractual relations, statutory tortious interference, IIED, invasion of privacy, and other common law torts, are all unconstitutional, "precluded by both the First Amendment and the Tennessee Constitution of 1796." Unsurprisingly, Ms. Griffin cannot

substantiate this unprecedented legal theory. Indeed, the one case to which Ms. Griffin cites in support of her argument falls neatly in line with the common law approach: that speech-based tort claims founded on "false and defamatory" speech are properly subject to the constitutional defense, but that those speech-based tort claims not founded on false and defamatory speech are not. In *Higgins v. Kentucky Sports Radio, LLC*, 951 F.3d 728 (6th Cir. 2020), the plaintiff tried to bring a "conspiracy to defame" cause of action arising where the defendant repeated the false and defamatory reviews posted by others on Twitter. *Higgins*, 951 F.3d at 739. The plaintiff's novel claim failed due to a pleading defect. *Id.* Plaintiff subsequently argued that he was "not bringing a defamation claim." *Id.* Nonetheless, the court required him to carry "the same First Amendment burden he must carry in a garden-variety defamation case." *Id.*

This case is not a garden-variety defamation action in disguise. Unlike the situation in *Higgins*, Plaintiffs' claims here are not founded on false and defamatory statements.[6] Ms. Griffin's reading of *Higgins* would essentially convert all speech-based torts into defamation actions. This outcome would fail to recognize that many speech-based torts, including those pled in this matter, do not necessarily derive from false and defamatory speech. None of the elements of the torts pled in this matter require that the speech on which they are based be false and defamatory. Ms. Griffin's argument indiscriminately overlooks the Supreme Court's carefully considered balance between the First Amendment and state tort law. *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254 (1964) (creating the "actual malice" requirement for certain state law defamation claims); *Cohen*, 501 U.S. at 669–71.

### C. Plaintiffs' Tortious Interference Claims are Well-Pled

Ms. Griffin makes two arguments concerning the three tortious interference claims. First,

---

[6]    In *Higgins*, the statements giving rise to the claim included false allegations of homosexual engagement with a minor, acceptance of bribes, and use of illegal labor in his business. *Higgins* was a college basketball referee who made a call against the home team, the University of Kentucky.

Ms. Griffin argues that all three claims, like all the other torts alleged, are barred on the ground of constitutional privilege under the First Amendment. (D. Memo. at 16–18). Second, Ms. Griffin argues that, because VisuWell tweeted about Mr. Johnson's termination before Ms. Griffin wrote her fourth and final tweet, she cannot be liable for tortious interference. (D. Memo. at 8–9). Neither argument is persuasive.

The constitutional defense assertion was discussed above. The cases that Ms. Griffin adds here do not suggest a different outcome. The First Amendment stands as a bar to tort claims only where those tort claims are based on false and defamatory statements and seek reputational damages without pleading defamation. *Owens v. Lead Stories, LLC*, No. S20C-10-016, 2021 Del. Super. LEXIS 515, *47–50 (Del. Super. Ct. July 20, 2021), *aff'd*, 273 A.3d 275 (Table) (Del. 2022) (tort claims, including defamation, were based on "defamatory and false" statements; "First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement") (quoting *Blatty v. New York Times Co.*, 728 P.2d 1177, 1184 (Cal. 1986)); *see also Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 857–58 (10th Cir. 1999) (defamation claim and other tort claims were based on injurious falsehood; therefore constitutional privilege applies); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3d Cir. 1985) (where the defamation claim was barred by the First Amendment, so was the intentional interference with contractual relations count). Again, Plaintiffs' claims in this matter are not based on false or defamatory statements. The constitutional limitations on defamation actions do not apply.

Ms. Griffin's second contention is without merit. She claims that the Complaint fails to allege that she knew about Mr. Johnson's employment relationship. Ms. Griffin asserts that Plaintiffs "speculate" with "conclusory allegations" that Ms. Griffin was aware that Mr. Johnson was employed at VisuWell. (D. Memo. at 18, n. 8). Yet Ms. Griffin's own tweets put the lie to this

contention. She initiated the social media onslaught with her initial tweet identifying Mr. Johnson as "Sam Johnson in Nashville, Tennessee, the CEO of VisuWell, healthcare-tech-growth strategist." (Compl. ¶ 81). She subsequently checks back with VisuWell, in a tweet a few days' later: "Has Sam Johnson has [sic] been removed from his position on the Board of Directors and, if not, what measures is Visuwell taking in this regard? Leaving Johnson on the Board raises an eyebrow that the company intends to rehire. Know the nation will remain vigilant." (*Id.* ¶ 90).

These are not "speculative" and "conclusory" allegations about Ms. Griffin's knowledge of Mr. Johnson's employment. They provide factual and indeed conclusive evidence that she was in fact aware that Mr. Johnson was employed at VisuWell. The Defendant adds in the usual citations to *Twombly* and *Iqbal* as if they are talismanic. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. Here they are of no avail; Ms. Griffin has stepped in it. She has provided factual evidence of her knowledge about Mr. Johnson's employment.

Ms. Griffin also states that she cannot be liable for tortious interference because her final tweet, where she checked in with VisuWell to make sure Mr. Johnson had been terminated from the Board, came after VisuWell had already tweeted about Mr. Johnson's termination as CEO. This claim by Ms. Griffin is of no moment: the damage from her tweets had already been done. Her first tweets accomplished his job termination and other injuries. That she checked back, in subsequent tweets, to make sure every opportunity Mr. Johnson had to make a living, including his Board membership, had been canceled, does not logically nor legally exculpate her from the tortious injury she caused.

### D.    The Plaintiff's Other Torts Are Well-Pled

#### 1.    Intentional Infliction of Emotional Distress ("IIED")

Ms. Griffin again argues that the First Amendment precludes liability even for the intentional infliction of emotional distress. That argument has been answered, above. Once

divorced from its presumed "constitutional protection," Ms. Griffin's tweets can serve as the basis for this tort as for any other. Ms. Griffin also avers that the Complaint fails to plead the requisite "severe emotional distress or mental anguish." Her argument on this point is that the Complaint does not include statements about missed time from work, interruption to social affairs, lost sleep, or psychiatric counseling. First, the requirement for pleading IIED is that the plaintiff plead emotional distress or mental anguish, not that the plaintiff plead lost time from work or social interruption. Second, as a matter of fact, the Complaint actually does plead lost time from work: Mr. Johnson's employment was terminated. (Compl. ¶¶ 97, 124, 132). He has lost all of his time from work. Similarly, Mrs. Johnson's business has suffered a loss in customers and profits. (*Id.* ¶¶ 101–103). The Complaint also includes numerous allegations of the social opprobrium, both personal and online, to which both Plaintiffs have been subject. (*Id.* ¶¶ 99–106). These threats have included murder and rape. (*Id.* ¶ 101). Mrs. Johnson in particular has suffered personal physical injury and physical sickness. (*Id.* ¶ 100). All of these allegations, and more, are factual and are contained in the Complaint. Ms. Griffin's contention that the Complaint "fails to recite any facts" about emotional distress and mental anguish is hyperbolic and patently absurd, particularly when an entire section of the Complaint is devoted to detailing those facts. (*Id.* ¶¶ 99–106). The Complaint adequately pleads IIED.

### 2. Invasion of Privacy – Intrusion upon Seclusion

Ms. Griffin argues here that Ms. Griffin's tweet, where she identified Mr. Johnson, his place of employment, and his home town, and declared that "it seems like he's dying to be online famous" actually reflected Mr. Johnson's desire to become famous, and not Ms. Griffin's desire to make him "online famous." This argument cannot be taken seriously: Ms. Griffin cannot plausibly claim that Mr. Johnson wanted to be the subject of a social media onslaught and thus sought, somehow, to bring himself into Ms. Griffin's crosshairs. Yet this is Defendant's lead

argument. Ms. Griffin's first tweet can only be read one way: that it was Ms. Griffin who was making Mr. Johnson "online famous," by stating his name, place of employment, and place of residence.

Ms. Griffin's second argument here is equally fallacious. It asserts that, because with respect to Mrs. Johnson, Ms. Griffin only revealed publicly available information, liability cannot attach. Ms. Griffin admits, as she must, that she tweeted out Mrs. Johnson's name, marital status, and city of residence. What she fails to admit is that she tweeted out that information as part of a video that misleadingly depicts her husband as aggressively confronting two teenagers, and that the entire tenor of the tweet was to raise trouble and cause harassment, including job loss and diminished business, for both Mr. and Mrs. Johnson. Ms. Griffin states that her conduct did not involve "doxing" because she did not disclose Plaintiffs' bank account or social security numbers or cellphone numbers, as if "doxing" were a legal term of art that required such details.[7]

### 3. Prima Facie Tort

Ms. Griffin brings out the First Amendment defense here, too, arguing that even the common law "prima facie" tort, which dates back centuries, is also unconstitutional where it is based on speech. This argument has been addressed above. Ms. Griffin also argues that Tennessee does not recognize the "prima facie tort," even though the Complaint cites to two decisions of the Supreme Court of Tennessee that apply this tort. In footnote twelve, Ms. Griffin states that this tort arises only "in connection with contract claims, as distinct from tort claims." (D. Memo. at 23, n. 12). The Defendant provides no citation for this assertion and does not explain what she means by stating that a tort claim cannot arise from a tort claim, but only a contract claim, if this

---

[7]   "Doxing" is slang and includes publicly identifying someone as a form of punishment or revenge. *Dox*, <u>Merriam-Webster Online Dictionary</u> (Aug. 17, 2022), https://www.merriam-webster.com/dictionary/dox. "Doxing" does not require that the information include bank account numbers or the like.

contention is understood correctly. In any event, a prima facie tort is recognized in Tennessee, *Hutton v. Watters*, 179 S.W. 134, 135 (Tenn. 1915); *Large v. Dick*, 343 S.W.2d 693, 694 (Tenn. 1960), and elsewhere. *National Nutritional Foods Association v. Whelan*, 492 F. Supp. 374 (S.D.N.Y. 1980) (prima facie tort provides relief for intentional infliction of harm under circumstances that do not lend themselves to a traditional cause of action); *Aikens v. Wisconsin*, 195 U.S. 194 (1904) ("prima facie, the intentional infliction of temporal damage is a cause of action").

### 4. Negligence Per Se

Ms. Griffin contends that the First Amendment precludes this tort, too. That argument is addressed above. The Constitution does no such violence to traditional state tort law.

Ms. Griffin also argues that the statutes at issue, Tenn. Code Ann. § 39-17-308 (proscribing criminal harassment) and Tenn. Code Ann. § 39-17-315 (proscribing criminal stalking) do not impose a standard of care. They do. Under Tennessee law, a claim of negligence per se can be based on a criminal statute. The plaintiff must allege:

> First, the defendant must have violated a statute or ordinance that imposes a duty or prohibition for the benefit of a person or the public. Second, the injured party must be within the class of persons intended to benefit from or be protected by the statute. Finally, the injured party must show that the negligence was the proximate cause of the injury.

*Slowik v. Lambert*, 529 F. Supp. 3d 756, 765 (E.D. Tenn. 2021) (citing *Shaw v. Metro. Government of Nashville & Davidson County*, 596 S.W.3d 726, 734 (Tenn. Ct. App. 2019)). Each of these elements is pled in the Complaint. Ms. Griffin's conduct constitutes criminal harassment and criminal stalking. Ms. Griffin maliciously and repeatedly published images of Mr. Johnson (the Video Clip and other images) on social media, calling upon her followers to make Mr. Johnson "online famous"; Ms. Griffin gave undue publicity to Mrs. Johnson, who was secluded and was not in any way involved with the Video Clip; and Ms. Griffin specifically described the town in

23

which the Johnsons lived, knowing and hoping that her followers would flood them with threats. Ms. Griffin intended her social media communication to be a threat, and Mr. and Mrs. Johnson reasonably understood Ms. Griffin's posts to be a threat of harm and a call to action. *See* Tenn. Code Ann. § 39-17-308(a)(1), (a)(4). Likewise, Ms. Griffin engaged in a course of conduct, through her multiple posts on social media, that would cause reasonable people to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and in fact did cause Mr. and Mrs. Johnson such feelings. *See* Tenn. Code Ann. § 39-17-315(a)(1), (a)(4). Indeed, Ms. Griffin accomplished what she set out to achieve: Mr. Johnson was terminated from his employment at VisuWell, and Mr. and Mrs. Johnson received many threats of harm online, including threats of murder and rape.

Tenn. Code Ann. § 39-17-308 and Tenn. Code Ann. § 39-17-315 impose a duty for the benefit of persons or the public. Mr. and Mrs. Johnson belong to the class of persons who are the intended beneficiaries of the law. Finally, Ms. Griffin's negligent and intentional conduct in harassing and stalking Mr. and Mrs. Johnson proximately caused their injuries. Ms. Griffin's tweets caused the Plaintiffs' severe financial and emotional damages.

### E. Tennessee Public Participation Act

Ms. Griffin concludes her memorandum by mentioning "as a placeholder" her request for dismissal and fees, citing the Tennessee Public Participation Act ("TPPA"). Ms. Griffin's invented "placeholder/petition" can be quickly denied by this Court. As Ms. Griffin grudgingly "recognizes" in her thirteenth footnote, in a point that should be made clear in the text, this Court has already ruled on the TPPA, twice. In both instances, the federal district court for the Middle District of Tennessee has held, consistent with the majority of federal courts in addressing similar state statutes, that the TPPA fatally conflicts with the Federal Rules of Civil Procedure and thus cannot form the basis of a petition. *Mucerino v. Martin*, No. 3:21-cv-00284, 2021 U.S. Dist. LEXIS

24

228340, at *17–19 (M.D. Tenn. Nov. 30, 2021) ("abundantly clear" that TPAA conflicts with Federal Rules 12 and 56); *Lampo Group, LLC v. Paffrath*, No. 3:180-cv-0142, 2019 U.S. Dist. LEXIS 122523, at *3–8 (M.D. Tenn. July 23, 2019) (same). Ms. Griffin argues that the TPPA confers a substantive right on the defendant, but as this Court wrote in *Mucerino*, the "self-evidently procedural nature" of the TPPA precludes its application in federal court. *Mucerino*, 2021 U.S. Dist. LEXIS 228340, at *16.

## CONCLUSION

Therefore, Ms. Griffin's Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim should be **DENIED**.

Respectfully submitted,

*/s/ Lyndsay C. Smith*
Lyndsay C. Smith (Bar No. 024715)
SMITH, PLC
311 22nd Avenue North
Nashville, Tennessee 37203
Phone: (615) 351-2442
Fax: (615) 866-9863
lsmith@smith-plc.com

and

Todd V. McMurtry (admitted *pro hac vice*)
J. Will Huber (admitted *pro hac vice*)
HEMMER DEFRANK WESSELS, PLLC
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiffs,*
*Samuel Johnson and Jill Johnson*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties indicated on the electronic filing receipt.

*/s/ Lyndsay C. Smith*
Lyndsay C. Smith (Bar No. 024715)
