# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: October 31, 2023

Mr. Michael J. Grygiel
Greenberg Traurig
54 State Street
Sixth Floor
Albany, NY 12207

Mr. Robb S. Harvey
Holland & Knight
511 Union Street
Suite 2700
Nashville, TN 37219

Mr. John William Huber
Hemmer Wessels McMurtry
250 Grandview Drive
Suite 500
Ft. Mitchell, KY 41017

Mr. Todd VanDerVeer McMurtry
Hemmer Wessels McMurtry
250 Grandview Drive
Suite 500
Ft. Mitchell, KY 41017

Mr. Geoffrey M. Pipoly
Bryan Cave Leighton Paisner
161 N. Clark Street
Suite 4300
Chicago, IL 60601

Mr. Adam Siegler
Greenberg Traurig
1840 Century Park, E.
Suite 1900
Los Angeles, CA 90067

Ms. Lyndsay Claire Smith
Law Office
311 22nd Avenue, N.
Nashville, TN 37203

      Re: Case No. 23-5257, *Samuel Johnson, et al v. Kathy Griffin*
         Originating Case No. : 3:22-cv-00295

Dear Counsel,

 The court today announced its decision in the above-styled case.

 Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

            Yours very truly,

            Deborah S. Hunt, Clerk


            Cathryn Lovely
            Deputy Clerk

cc: Ms. Lynda M. Hill

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0240p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

SAMUEL JOHNSON and JILL JOHNSON, in their individual capacities,

    *Plaintiffs-Appellants*,

  *v.*

KATHY GRIFFIN, in her individual capacity,

    *Defendant-Appellee*.

No. 23-5257

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00295—William Lynn Campbell, Jr., District Judge.

Argued: October 17, 2023

Decided and Filed: October 31, 2023

Before: SUTTON, Chief Judge; COLE and THAPAR, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Todd V. McMurtry, HEMMER DEFRANK WESSELS, PLLC, Fort Mitchell, Kentucky, for Appellants. Michael J. Grygiel, GREENBERG TRAURIG, LLP, Albany, New York, for Appellee. **ON BRIEF:** Todd V. McMurtry, J. Will Huber, HEMMER DEFRANK WESSELS, PLLC, Fort Mitchell, Kentucky, Lyndsay C. Smith, SMITH, PLC, Nashville, Tennessee, for Appellants. Michael J. Grygiel, GREENBERG TRAURIG, LLP, Albany, New York, Adam Siegler, GREENBERG TRAURIG, LLP, Los Angeles, California, Robb S. Harvey, HOLLAND & KNIGHT, LLP, Nashville, Tennessee, for Appellee. Geoffrey M. Pipoly, BRYAN CAVE LEIGHTON PAISNER LLP, Chicago, Illinois, for Amicus Curiae.

  SUTTON, C.J., delivered the opinion of the court in which COLE and THAPAR, JJ., joined. COLE, J. (pp. 10–13), delivered a separate concurring opinion.

**OPINION**

SUTTON, Chief Judge.  Kathy Griffin, a California-based celebrity and social activist, sent a series of tweets to her two million Twitter followers asserting that Tennessean Samuel Johnson, the CEO of Tennessee-based VisuWell, had engaged in homophobic conduct.  She encouraged her followers to make him "online famous" and tagged his company.  She then asked his employer to "remove[]" him from the Board of Directors and threatened that the "nation w[ould] remain vigilant" if it did not.  Within a day of her first tweets, the company fired Johnson and removed him from the Board.  Johnson and his wife sued Griffin in federal court in Tennessee, claiming (among other things) that she tortiously interfered with his employment.  Griffin argued that her tweets did not subject her to the State's personal jurisdiction, and the district court dismissed the case.  We disagree and reverse.

I.

On April 24, 2021, Samuel Johnson sat down for dinner at a hotel in Franklin, Tennessee.  Shortly after, a group of forty to fifty teenagers began taking prom pictures nearby.  The boisterous teenagers apparently disturbed Johnson and other customers, prompting him to ask the chaperone to settle them down.  One of the teens, who was wearing a red prom dress, overheard the request and confronted Johnson, all while his boyfriend filmed the interaction.  The video is not a picture (or record) of clarity.  But at a minimum, it captures Johnson saying that the student in the red dress "look[s] like an idiot."  Kathy Griffin (@kathygriffin), *Twitter* (Apr. 26, 2021, 1:45AM), https://twitter.com/kathygriffin/status/1386556994560020481?s.  And at a minimum, it captures the boyfriend trying to goad Johnson into reacting still more negatively to the student's attire.  Johnson left the hotel to have dinner somewhere else.

The boyfriend posted the video to his TikTok account.  TikTok deleted the clip soon after.  But other users downloaded it and reposted it to social media sites, including Twitter.  The clip came to the attention of VisuWell's Board chairman, who assured Johnson that the company would stand by him.

That situation changed starting at 1:45 in the morning of April 26, when Kathy Griffin retweeted the clip to her two million followers. It came with this comment: "If this is Sam Johnson in Nashville, Tennessee, the CEO of @VisuWell, healthcare-tech-growth strategist, married to Jill Johnson where they may reside in Franklin, Tennessee, it seems like he's dying to be online famous." R.1 at 15, ¶ 81. Below the tweet is the video accompanied by this caption (apparently not supplied by Griffin): "Homophobic POS [piece of s***] in Tennessee harasses a teenager for wearing a dress to prom." *Id.* at 15–16, ¶¶ 77, 81–82. As with other incidents in which Griffin has "doxed" individuals by accusing them of bad behavior and posting their addresses and workplaces on the internet, her tweet identified Johnson as a Nashville-based "healthcare-tech-growth strategist" and the CEO of VisuWell. She also tagged VisuWell, which meant that the tweet went directly to VisuWell and which enabled her readers to link directly to the company's profile if they wanted to add their two cents. When the boyfriend tweeted at Griffin within the hour to express his thanks for taking his video "viral," she replied that she was "grateful" he had filmed it and offered to do "anything" she could do to help. *Id.* at 17–18, ¶ 83. Several hours later, Griffin tweeted two pictures of Johnson's face with the caption: "Who is? THIS Sam Johnson of Franklin Tennessee." *Id.* at 20, ¶ 86.

In response to Griffin's first tweet, several VisuWell customers condemned Johnson and threatened to reevaluate their business ties. At the time, VisuWell was a fast-growing tech start-up, whose "commercial success," according to the complaint, "was due in large part to the proprietary software program" Johnson developed. *Id.* at 3, ¶ 14. During his three years as CEO, the complaint notes, he "helped increase its sales by 1,200%." *Id.* at 3, ¶ 13. Despite its prior offer of support, VisuWell fired Johnson as the CEO and announced this decision on Twitter in a reply to Griffin's original tweet. Griffin responded to VisuWell's tweet by asking if it had removed Johnson from the Board as well and demanding to know what "measures" VisuWell was taking. *Id.* at 22, ¶ 89. She warned that keeping him on the Board would suggest that it "intends to rehire" him, adding that "the nation will remain vigilant." *Id.* VisuWell responded that it had fired him, then clarified in a follow-up tweet that it no longer employed Johnson in any capacity. Still, the Johnsons continued to receive threats and face harassment while some of Griffin's followers celebrated by tweeting that they had succeeded.

No. 23-5257     *Johnson, et al. v. Griffin*     Page 4

The Johnsons sued Griffin in federal court in Tennessee for tortiously interfering with Johnson's employment, inflicting emotional distress, invading their privacy, and negligently injuring them. The district court dismissed the lawsuit for lack of personal jurisdiction over Griffin.

II.

Federal courts start with state law in determining whether they have personal jurisdiction over a defendant in a diversity case. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see* Fed. R. Civ. P. 4(k)(1)(A). At its broadest, Tennessee's long-arm statute authorizes courts to exercise personal jurisdiction "[o]n any basis not inconsistent with the constitution . . . of the United States." Tenn. Code Ann. § 20-2-225(2). The Fourteenth Amendment's Due Process Clause limits state courts' ability to exercise jurisdiction over an out-of-state defendant. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Because the parties have not identified any other section of Tennessee's long-arm statute that would determine jurisdiction here, "due process is all we must address." *Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019).

Due process requires the defendant to possess "certain minimum contacts with" the forum State "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted). Contacts with a forum state may generate two potential types of personal jurisdiction over an out-of-state defendant—"specific" jurisdiction arising from the defendant's "case-related contacts" and "general" jurisdiction arising from the defendant's "generic connections" to the State. *Power Invs., LLC v. SL EC, LLC*, 927 F.3d 914, 917 (6th Cir. 2019); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 139 (2023) (plurality opinion). At stake in this case, as the parties agree, is only the possibility of specific jurisdiction over Griffin.

To possess specific jurisdiction over an out-of-state defendant, the defendant's "suit-related conduct" must show a "substantial connection with the forum State." *Walden*, 571 U.S. at 284. Tortious conduct satisfies this requirement when the defendant intentionally cultivates contacts with the forum State, as opposed to forming "random, fortuitous, or attenuated

contacts." *Id.* at 286 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal marks omitted)).

Two cases "bookend" this application of personal jurisdiction to intentional torts. *Power Invs.*, 927 F.3d at 918. The first, *Calder v. Jones*, establishes that the effects of intentional torts sometimes may establish personal jurisdiction. In that case, a California actress sued Florida journalists in California for publishing a libelous article. 465 U.S. 783, 784–85 (1984). The Supreme Court permitted the California court to exercise personal jurisdiction over the journalists, observing that they had engaged in intentional conduct "expressly aimed at California," not "untargeted negligence." *Id.* at 789. They consulted "California sources" for the article whose "focal point" concerned California. *Id.* at 788–89. And they knew that the actress would experience the brunt of the injury in California, where the magazine had its largest circulation and where she lived and worked. *Id.*

The second case, *Walden v. Fiore*, identifies the other side of the line. In *Walden*, professional gamblers from Nevada sued an officer for seizing their cash at a Georgia airport. 517 U.S. at 281. Although the officer had formed "contacts with [the gamblers]," whom he knew lived in Nevada, he had "no jurisdictionally relevant contacts with Nevada." *Id.* at 289. The officer had never traveled to the State, let alone conducted activities in or contacted anyone there. *Id.* His alleged torts against the Nevada residents occurred in Georgia, not Nevada. *Id.* at 288. Only Georgia had personal jurisdiction over him. *See id.*

Griffin's actions have more parallels to *Calder* than to *Walden*. *See Power Invs.*, 927 F.3d at 919. As in *Calder*, the allegedly tortious "story concerned the [Tennessee] activities of a [Tennessee] resident. It impugned the professionalism of [an executive] whose [] career was centered in [Tennessee]." 465 U.S. at 788. And the tweet "was drawn from [Tennessee] sources." *Id.* Griffin intended that the "brunt of the harm" would befall Johnson in Tennessee when she urged her followers to pressure VisuWell, a Tennessee-based company, to fire him and urged VisuWell to remove him from the Board. *Id.* at 789.

Griffin's repeated emphasis of Johnson's residence in Franklin and the company's home base in Nashville hammers that home. She "undoubtedly knew" that the "focal point" of her

tweets concerned Tennessee. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007). Confirming the point, Griffin's initial tweet "cop[ied] VisuWell directly" at the same time that she threatened Johnson and identified him as based in Tennessee—indeed more specific than that, as she told people his wife's name and that they lived in Franklin, a suburb of Nashville. Following VisuWell's tweet that it had fired Johnson, Griffin inquired whether it had removed Johnson from its Board, cautioning that "the nation will remain vigilant" if it had not. R.1 at 22, ¶ 89. These intentional threats to VisuWell's Tennessee-based business plainly affected Tennessee. *See MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 902 (6th Cir. 2017); *cf. Johnson v. Univ. Hosps. Health Sys., Inc.*, No. 3:21-cv-00656, 2023 WL 5538980, at *1–2 (M.D. Tenn. Aug. 28, 2023) (declining to dismiss Johnson's tortious interference claim against a disgruntled Ohio-based VisuWell customer). And they had real world consequences for Tennessee: Johnson not only lost his livelihood, but VisuWell also lost its leader and likely customers.

Griffin counters that *Blessing v. Chandrasekhar* leads to a different conclusion. 988 F.3d 889 (6th Cir. 2021). The case has many parallels to this one, most notably a lawsuit arising from the Twitter activity of Kathy Griffin. But to us, *Blessing* captures the other side of the line. In that instance, Griffin posted about an "incident" involving Kentucky students on a trip to Washington, D.C. *Id.* at 892–93. Her tweets encouraged followers to "[n]ame these kids," "[s]hame them," and "let [their school] know how you feel about their students['] behavior." *Id.* at 893. We concluded that Griffin's actions did not satisfy Kentucky's long-arm statute, then added that personal jurisdiction would not have satisfied due process even if they had. *Id.* at 903–07. We reasoned that these tweets, all targeting actions in Washington, D.C., resembled *Walden* more than *Calder* because Griffin never took any "affirmative steps" to communicate with individuals in Kentucky when she tweeted about the student's conduct. *Id.* at 906. And the students felt the tweets' harm "wherever [they] happened to be located," not just in Kentucky. *Id.* at 906 n.17.

Missing in *Blessing* were allegations that Griffin had intentionally targeted Kentucky when provoking efforts to harass the students. *See id.* at 906. The Johnsons' complaint, in marked contrast, focuses on Griffin's conduct that targeted Tennessee. *See Peters Broad. Eng'g,*

*Inc. v. 24 Cap., LLC*, 40 F.4th 432, 437 (6th Cir. 2022). In *Blessing*, Griffin never communicated with the Kentucky school. Here, Griffin directly communicated with VisuWell in her first tweet and, after that tweet prompted his firing, she followed up directly with VisuWell to urge it to dismiss Johnson from its Board of Directors, all while promising more harassment if the Tennessee company did not bow to her wishes. Unlike Griffin's tweets that affected Kentucky after its students returned home, her contacts with VisuWell went beyond targeting the Johnsons to affecting "the state" and indeed its "economy," "more broadly." *Schmückle*, 854 F.3d at 902. While Griffin's tweets in *Blessing* arose from conduct in Washington, these tweets drew on a Tennessee source—the boyfriend's video—to attack a Tennessee resident for his conduct in Tennessee. *See Calder*, 465 U.S. at 788–89.

Had Griffin done in *Blessing* what she did here, the case would have come out differently. Imagine if she had written to the students' Kentucky school and urged it to dismiss them. Imagine if she had committed an intentional tort by lying about, or recklessly describing, what had happened in a message to their principal. And imagine if the school had dismissed the students as a result. This intentional tort would have sufficiently targeted the Commonwealth, and we have little doubt that the case would have permitted personal jurisdiction over her. Just as one cannot avoid personal jurisdiction by putting the tortious missive in a private letter to a school or company, *see Schneider v. Hardesty*, 669 F.3d 693, 696–97 (6th Cir. 2012), one cannot do the same by telling the world about it in a public letter, *Tamburo v. Dworkin*, 601 F.3d 693, 706 (7th Cir. 2010); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1075–77 (10th Cir. 2008) (Gorsuch, J.). Due process provides no refuge for lies or reckless conduct directly sent to a decisionmaker in a forum, *see Schneider*, 669 F.3d at 696–97, 703–04, and it does not shield someone who intentionally incites third parties against that decisionmaker, *see Tamburo*, 601 F.3d at 707.

In the context of this employment dispute, the resolution is even more straightforward. We have not hesitated to hold that personal jurisdiction satisfies due process when a defendant's communications to decisionmakers in the forum state led to the plaintiff's firing. *See Koch v. Loc. 438, United Autoworkers Union*, 54 F. App'x 807, 811–12 (6th Cir. 2002) (per curiam) (finding due process satisfied when a union official convinced the executive board to draft a

No. 23-5257                     *Johnson, et al. v. Griffin*                     Page 8

letter that prevented the plaintiff from obtaining new employment out of state); *Onderik v. Morgan*, No. 88-1904, 1989 WL 118728, at *4 (6th Cir. Oct. 10, 1989) (per curiam) (establishing personal jurisdiction in a wrongful discharge case based partly on out-of-jurisdiction telephone calls and letters). That is especially so when the allegedly untrue statements tortiously interfered with an employment contract. *See Dorn v. Dominique*, Nos. 22-5620/5682, 2023 WL 2543714, at *5–6 (6th Cir. Mar. 14, 2023) (per curiam) (order) (holding that out-of-state phone calls defaming Kentucky musician's agent sufficed to establish personal jurisdiction in Kentucky over the agent's tortious interference claim); *see also Burri Law PA v. Skurla*, 35 F.4th 1207, 1210–11, 1214–15 (9th Cir. 2022) (basing personal jurisdiction on calls and correspondence attacking plaintiff's competence). We see no reason why tweets sent directly to the decisionmaker do not suffice as well. *See also Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) ("The acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant[.]").

Griffin responds that she disseminated these tweets generally to her two million followers, and mere knowledge that some Tennessee residents would read them does not suffice to establish personal jurisdiction. *See Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1120 (6th Cir. 1994). But she cannot deny that, by tagging VisuWell, she sent these communications directly to the company. And she cannot deny that her follow-up tweets about removing Johnson from the Board amounted to direct communications with the Tennessee company. By also sending these tweets to every state in the country through her two million followers, she does not inoculate herself from personal jurisdiction in a targeted state. Targeting Johnson and VisuWell in Tennessee, based exclusively on conduct in Tennessee, and urging action in response in Tennessee, "tether[ed]" those effects to the forum. *Blessing*, 988 F.3d at 906; *see Tamburo*, 601 F.3d at 707 (finding personal jurisdiction where posts had "the express goal of inflicting commercial and reputational harm" on a man and his business). That conclusion would hold even if she had called only on non-Tennesseans to engage in her campaign. *See Dudnikov*, 514 F.3d at 1076.

What of the reality that, by tagging VisuWell, she also facilitated her broader communication efforts? The tagging, in other words, did two things: It directly communicated

with the company's decisionmakers about firing Johnson, and it facilitated her speech by simplifying the process of allowing her followers to chime in about Johnson's conduct. *Calder* tells us not to factor in First Amendment defenses in resolving a personal jurisdiction defense. 465 U.S. at 790–71. That means that when the same act has two consequences—one creating jurisdiction, the other facilitating speech—the First Amendment has nothing to do with the jurisdictional inquiry.

Griffin, last of all, asks us to dismiss the complaint for failure to state a claim. But the district court should evaluate those arguments in the first instance. *See Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 649 (6th Cir. 2015).

We reverse and remand.

---

## CONCURRENCE

---

COLE, Circuit Judge, concurring. I would also reverse the district court's decision because I agree that Kathy Griffin's direct communications with VisuWell about Samuel Johnson's employment, albeit via Twitter, subject her to personal jurisdiction in Tennessee. I write separately to discuss the applicable legal framework and how it applies in the social media context.

The facts of this case center around "Griffin's tweets concern[ing] the Video Clip of the April 24 Incident, which occurred at the Harpeth Hotel in Tennessee." (Compl., R. 1, Page ID 8, ¶ 38; Compl. Ex. B, R.1-2, Page ID 111.) The fifty-nine second video, which does not capture the entire incident, first shows the teenager wearing a red prom dress speaking with Johnson in the hotel's courtyard. The teenager says, seemingly in continuance of an ongoing conversation, "I chose what I want to wear so you can f*** off." To which Johnson smiles and responds, "is that right . . . is that right?". The teenager then walks toward the hotel lobby to get away from Johnson, but Johnson follows him and says, "you look like an idiot." The teenager's boyfriend continues to film while the teenager in the dress tells Johnson to get away from him. Johnson then reaches across the teenager in the dress and apparently attempts to smack the boyfriend's phone out of the way. Other adults in the courtyard appear to intervene by repeatedly asking Johnson to "please stop," while also telling him that "it's a bunch of kids," "it's a special night for them," and "just don't let one thing bother you." The clip ends shortly thereafter as the situation deescalates.

Griffin did not know the Johnsons or prom-goers before this incident, but she has a history of online advocacy. (*See* Compl., R. 32, Page ID 7, ¶ 32.) Indicated by the complaint, Griffin "has stated that she is an advocate for LGBTQIA+ rights and has organized various rallies and published various statements to that effect." (*Id.* at ¶ 33.) Griffin also noted in her tweets to the boyfriend who first posted the clip that she was "proud to be an ally" and to "[l]et [her] know if there's anything [she] can do to help." (Compl., R. 1−3, Page ID 55.)

Our court's three-part test appropriately governs this case. Exercising jurisdiction over Griffin accords with due process if we find (1) Griffin purposefully availed herself of the privilege of acting or causing a consequence in Tennessee, (2) the cause of action arose from her Tennessee activities, and (3) Griffin's actions, or the consequences she caused, have a sufficiently substantial connection with Tennessee to make the exercise of jurisdiction reasonable. *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017); *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012).

Purposeful availment is the touchstone of the inquiry,[1] and given Griffin's direct communications with VisuWell, our precedent makes clear that this prong is met here. In *Schneider*, we found purposeful availment was satisfied where the defendant allegedly sent two letters with fraudulent information to investors in Ohio with the intent that those investors would rely on that information to their detriment. 669 F.3d at 702−03 ("[P]urposeful availment may exist when a defendant makes telephone calls and sends [faxes] into the forum state and such communications form the bases for the action.") (quoting *Intera Corp*, 428 F.3d at 616) (internal quotation omitted). Like *Schneider*, Griffin's conduct consisted of two direct communications aimed at the forum state with an alleged intent to cause a consequence there. 669 F.3d at 702−03. Specifically, Johnson alleges that VisuWell "terminated [his] employment contract as a result of [] Griffin's conduct." (Compl., R. 1, Page ID  31, ¶ 132.)  Thus, the "two [tweets] that [VisuWell] received in [Tennessee] form the basis for the action at issue," here, loss of employment, and Griffin sending communications into Tennessee with the alleged intent to cause this "consequence" satisfies purposeful availment. *Schneider*, 669 F.3d at 701−702 (marks and citation omitted); *cf. Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) ("[W]here, as

---

[1]We have held that the second "[a]rising from" prong "is subject to a lenient standard," *Schneider*, 669 F.3d at 703 (internal quotation omitted), and it is satisfied when "the operative facts of the controversy arise from the defendant's contacts with the state." *Intera Corp. v. Henderson*, 428 F.3d 605, 617 (6th Cir. 2005) (internal quotation omitted). Given this lenient standard, the second prong is satisfied here. *Id.* ("[P]ersonal jurisdiction may exist over a defendant although [s]he is not physically present in the forum if [s]he purposefully directs communications into the forum [and] those communications form the heart of the cause of action.") (internal quotation omitted).

Further, if the first two prongs of the test are met, then "an inference of reasonableness arises and only the unusual case will not meet [the substantial connection] criteria." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 554 (6th Cir. 2007) (marks and citation omitted). Considering the typical factors we assess for the third prong, Griffin has not put forward sufficient considerations to "overcome or contradict" the inference of reasonableness here. *Id.* at 555.

here, the plaintiff's claims are for intentional torts, the inquiry focuses on whether the conduct underlying the claims was purpose[fully] directed at the forum state."). The majority cites to employment cases that confirm this point. (Maj. Op. at 8−9.)

Future cases involving communication via social media, including Twitter, may not be as straightforward. As we noted in *Blessing*, "[o]ur sister circuits have routinely held that 'posting allegedly [tortious] comments or information on an internet site does not, *without more*, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside).'" (emphasis added). *See Blessing v. Chandrasekhar*, 988 F.3d 889, 905 n.15 (6th Cir. 2021) (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011)). In the social media context, our precedent and other circuits illustrate that "something more" most likely means a sufficient showing of intent. *Id.* at 906 (finding no personal jurisdiction where "[t]here [was] no evidence that the defendants posted the[ir] tweets hoping to reach [the forum state] specifically as opposed to their Twitter followers generally"); *see also Shrader*, 633 F.3d at 1240−41 ("[I]t is necessary to adapt the analysis of personal jurisdiction to this unique circumstance by placing emphasis on the internet user or site *intentionally directing* [their] activity or operation *at* the forum state . . . .") (emphasis in original) (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712−14 (4th Cir. 2002)).

I previously emphasized two points in the record—Johnson's behavior in the video clip and Griffin's history of LGBTQIA+ advocacy online—because both facts would play a more significant role in the purposeful availment inquiry if Griffin's communications into Tennessee were less apparent. To be clear, purposeful availment is satisfied here because of Griffin's direct communications with VisuWell about Johnson's employment, but the ever-changing mechanics of social media platforms might make this inquiry in other cases more difficult.

Imagine, for example, if Griffin's first retweet of the video clip were the exact same but for tagging or referencing VisuWell by name, instead reading: "If this is Sam Johnson in Nashville, Tennessee, the CEO of [a] healthcare-tech-growth [company] . . . it seems like he's dying to be online famous." (*See* Compl. Ex. B, R.1-2, Page ID 111) (shrugging and rainbow flag emojis omitted). Excluding the VisuWell tag is only a minor, nine-character deviation from the original tweet, but—without the tag—the tweet would no longer be a direct communication

with VisuWell by Twitter's specifications.  Indeed, some other user would most likely have to bring the tweet to VisuWell's attention, and this "third party['s]" contact with VisuWell may not satisfy the purposeful availment requirement.  *See Blessing*, 988 F.3d at 906 (rejecting plaintiff's argument that defendants' tweets "caused third parties to 'dox' the plaintiffs in [the forum]" because "'it is the defendant, not the plaintiff or third parties, who must create contacts with the forum state'") (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

Whether Griffin intended to create contacts with the forum state would be much less clear when analyzing the edited tweet.  To solve this problem, we would need to further scrutinize the record as to whether Griffin's post was (a) "passive" activity on the internet meant to facilitate her broader advocacy efforts by condemning problematic behavior, or instead, (b) deliberately directed into Tennessee with the intent to cause consequence there.  *See Shrader*, 633 F.3d at 1241 (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (drawing a line between (a) "[p]assive [i]nternet activity" and (b) "directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State")).  It can certainly be the case that in furtherance of her advocacy efforts, Griffin also intended to establish sufficient contacts with Tennessee.  Due process does not allow us to find specific jurisdiction, however, without the latter finding of intent.

Finally, I agree with the majority that it is for the district court to evaluate the merits of this case in the first instance.  (Maj. Op. at 9.)  Our opinion also does not comment on the veracity of Johnson's allegations in making our personal jurisdiction determination.  Instead, when making this determination on written submission, we determine if Johnson has made a "*prima facie* showing that personal jurisdiction exists."  *See Serras v. First Tenn. Bank Nat'l. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989).  Because Johnson has met his burden here, I concur.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-5257

SAMUEL JOHNSON and JILL JOHNSON, in their individual capacities,

    Plaintiffs - Appellants,

    v.

KATHY GRIFFIN, in her individual capacity,

    Defendant - Appellee.

**FILED**
Oct 31, 2023
DEBORAH S. HUNT, Clerk

Before: SUTTON, Chief Judge; COLE and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk